IN RE WHITTINGTON.

12

(No. 421—Decided January 3, 1967.)

Mr. E. Raymond Morehart, prosecuting attorney, and Mr. S. Ferrell Jackson, for appellee State of Ohio.

Mr. Jack Supman and Mr. Judson C. Kistler, for appellant Buddy Lynn Whittington.

RUTHERFORD, P. J.   This is an appeal by Buddy Lynn Whittington from a judgment of the Juvenile Court finding him to be a delinquent child.

On August 5, 1966, a complaint was filed in the Juvenile Court of Fairfield County by Elwood R. Phillips, the pertinent part of which reads:

"The undersigned says that he has knowledge of Buddy Lynn Whittington, a minor under the age of 18 years, to wit, the age of 14 years; that said minor appears to be a delinquent child in this; that he did, on or about the 29th day of July, 1966, in the village of Baltimore, county of Fairfield, state of Ohio, unlawfully, purposely and maliciously kill one Gladys Willard, contrary to Section 2901.05 of the Revised Code of Ohio."

Elwood R. Phillips was the Chief of Police of Baltimore.

On August 5, when the complaint was filed, the Judge of the Juvenile Court ordered a warrant to issue to the

Probation Officer for the arrest of Buddy Lynn Whittington and that, when arrested, he be brought before the court. He was arrested and brought before the court on the same day and has from the time of his arrest had representation of counsel.

Since August 5, Buddy has been held in detention by the Juvenile Court, during part of which time he has been at the Juvenile Diagnostic Center.

On August 10, a motion was filed requesting that Buddy be released to his parents.

On August 11, a journal entry was filed as follows:

"This 11th day of August, 1966, came E. Raymond Morehart, Prosecuting Attorney, also came Buddy Lynn Whittington along with his counsel, Jack Supman and Judson Kistler, to be arraigned upon a charge of delinquency. Also present were the parents of said child, Orville A. Whittington and Ollie Mae Whittington. The charge was distinctly read to Buddy Lynn Whittington and he was required to plead thereto.

"Whereupon the said Buddy Lynn Whittington through his counsel entered a plea of 'not guilty' to said charge. It is therefore ordered by the court that said case be set for hearing on the 24th day of August, 1966 at 9:30 o'clock a. m.''

On August 24, hearing was held and testimony taken on the motion of Buddy to be released to his parents, placed on bond or sent to the Franklin County Detention Home while this matter is pending. That motion was overruled, and the cause continued for further hearing on September 2, 1966.

At the hearing on September 2, 1966, in addition to the testimony then taken, it was stipulated that the testimony taken on the motion on August 25 be included, and the bill of exceptions contains a complete transcript of all the proceedings.

Buddy's parents were normally at home, but on July 29 they left about 7 or 7:30 a. m. to visit a relative in Canton, Ohio. Buddy was up at the time, but was left at home

alone so that he might attend a summer school class in which he was enrolled at Liberty Union School. The class was scheduled at 8:30 a. m.

The Whittingtons lived at 215 Fremont Street. The decedent, Mrs. Gladys Willard, was a neighbor who lived with her husband, Herman Willard, across the street at 220 Fremont. A son, Jack Willard, also lived in the home with his parents. Jack had been separated from his wife for approximately nine months. They had previously lived two doors from his parents. The record does not disclose the whereabouts of Jack's wife or his children, with whom Buddy had played when Jack's family was together. Dick Willard, also a son of the decedent, lived with his wife, Lula, and daughter, Susan, at 226 Fremont, next door to his parents. The decedent's mother, Mrs. Stella Brandon, and a sister, Genevieve Anderson, lived at Route 1, Baltimore. Another sister, Aurilla Goodrich, resides in Florida, but in July she was visiting at the Brandon home.

Herman, the decedent's husband, worked for Adam Poff on a farm and left for work about 6 a. m. on July 29.

Jack testified that his mother called him and prepared his breakfast at 6:20, and that he left for work at approximately 6:50 and was at work at the Defense Construction Supply Center, Columbus, Ohio, at 7:45 a. m.

The daughter in law, Lula, testified that her husband, Dick, had gone to work at 6:45 a. m.

Elwood R. Phillips testified that he later talked to neighbors; that Mrs. Estep said she saw Mrs. Willard at approximately 6:30 a. m. on July 29 at the rear of her lot, presumably feeding her chickens, at which time she talked to her briefly; and that Mrs. Barber stated she saw Mrs. Willard at 7:30 or a quarter of eight in her own yard drawing water from a hydrant, presumably for her dog. There was no objection made to this hearsay testimony.

It was blackberry season, and Gladys Willard was in the habit of going out mornings to pick blackberries in nearby areas. Her sister, Genevieve Anderson, also often went blackberry picking in the morning. On Friday mornings it was the custom of Gladys Willard to drive to her

sister Genevieve's at about 10 a. m. and they would go shopping in Lancaster.

The daughter in law, Lula Willard, who lived next door, testified that she went to Mrs. Willard's house at 8:40 a. m. to ask that she bring her girl a pair of pajamas when she went shopping. No one answered the door, but her car was there. At 10 a. m. Lula tried again, but no one answered at Mrs. Willard's home.

At 11:45 a. m. Genevieve called Lula to inquire, and Lula sent her daughter to check. She found no one home, but the car was still there.

Shortly thereafter a search was commenced. Numerous people joined in the search, including Buddy Lynn Whittington, neighbors and relatives. Later in the afternoon they were joined by law enforcement officials. Primarily, the search covered areas where there were blackberries.

Late in the afternoon, Buddy went to play ball. His parents returned home at approximately 7:30 p. m.

As to what happened at this time, Mr. Whittington testified:

"Well, I went and looked for the key, and the key wasn't there, or at least I didn't find it. And somebody said Buddy was at ball practice, which I would have known if I had given it a second thought. And I don't know who said it, but I went to the school house after him. And he had ridden his bicycle up there, and I asked him about the key, if he had it in his pocket, and he said, "No.' So he got on his bicycle and went home; and we unlocked and went in the house.

"Q. Where was the key? Was it in a different place from where you always keep it? A. It was * * * there's a pipe hanger up there where we always put the key. I mean, in this space across there, and there's a little space about four inches, and he stuck it in there between the pipe hanger, which we always keep it over on the other side, or most of the time, and that's where I missed it. I just didn't look in that space."

After testifying that he had taken some things into

the house, Mr. Whittington testified further, as follows:

"Q. What did you do after you went back outside? A. I run into Mrs. Mauger out there, and she said 'I searched my house everyplace.' She said, 'I went in and looked through my wardrobes, the closets in her house.' I said, 'Well, I'll go check the garage.' You know our garage is right there back of the house.

"Q. Is the garage kept locked? A. No.

"Q. I see. A. Of course, I went in there and looked, and I went from there in the house. I looked and went back out.

"Q. Then what did you do, sir? A. I fooled around outside awhile, and I got to thinking there could only be one place that I missed looking. So I went back and started looking under the beds.

"Q. Did anybody go with you? A. Yes, Buddy went along.

"Q. Buddy went with you? A. Yes.

"Q. How many bedrooms do you have, Mr. Whittington? A. Three.

"Q. Three bedrooms, and where are they in relation to your house? A. They're on the north side. They're in rotation. We sleep in the one to the west, and Buddy in the middle one, and the other * * *.

"Q. Now, how did you check under the beds, will you tell us just what you did? Which bedroom did you start with? A. I started with our bed.

"Q. With your bedroom? A. In the beginning, I never expected to find Mrs. Willard in the home like that.

"Mr. Morehart: Well, I have no doubt about that, sir.

"The reason I thought of it, was because her and her husband had trouble, and Jack's there; and him and his wife have a lot of trouble. And I thought it was more than she could take, and I figured she would rather die in our house than in her own home.

"Q. I see. That was what you maybe were thinking, why you would look, make such a thorough search of your house? A. Yes.

"Q. Now when you went * * * was Buddy with you when you checked the bedrooms? A. Yes.

"Q. Or did he check certain bedrooms and you check certain bedrooms? A. No, he just went down there and looked in; and I looked under one and he went to the next one. And he went on over and walked up there to the end of the vanity, and he just stopped there.

"Q. He walked up to the end of the vanity and stopped? A. He was looking at some model cars he's got there. He's got the whole top of it covered.

"Q. Did he help you look under your bedroom, under your bed? A. No. He didn't look. He just walked through. He goes with me every place I go.

"Q. I see, and he was with you when you looked under the bed in your bedroom? A. Yes.

"Q. And you found nothing there? A. No.

"Q. You came out then to his bedroom then, which would be the next bedroom, and you say he walked up to the vanity and stops and starts looking at some little cars? A. Yes.

"Q. Now where did you look under his bed at? Where were you when you looked under his bed? A. Just about middle-ways.

"Q. On which side? A. It would have been on the south side.

"Q. On the south side; that's as you come into the bedroom, is it not? A. Yes.

"Q. Did you get down on your hands and knees? A. Yes, I got down on my hands and knees and pulled the spread up and * * *.

"Q. Were you able to see her at that time? A. Yes, sir.

"Q. What did you say? A. I just don't remember.

"Q. What did you do then, right then? A. I got up and went outside and called my wife, told her.

"Q. Did you say anything to Buddy? A. Yes, I said to him, I said something like, 'Here she is under your bed.'

"Q. What did he say? A. I just can't recall exactly

what he said. He says, 'Oh, no' or 'can't be' or something similar to that. And he knelt down and looked.''

The bedrooms were all on the first floor. The parent's bedroom was to the left as one would come in the back door, and Buddy's bedroom was next to it. Everything in the house appeared to be in order at the time Mr. Whittington searched the house.

The Sheriff and Coroner were called. There was a general inquiry of those present as to what had happened. Chief of Police Elwood R. Phillips testified that he and Mr. Berry from the Sheriff's department talked to the family and asked Buddy if he had been around home all day and that he stated, ''Yes.'' An objection to statements of Buddy was overruled, and it was stipulated that continuing objections could be had to testimony as to anything said by Buddy. Mr. Phillips then testified as follows:

''A. I asked Buddy if he were there all morning and he said, 'Yes.' And I asked him if he was alone and he said, 'Yes.' I asked him if he had seen Mrs. Willard, and Buddy stated, 'Yes, she had come to the door about eight o'clock, returned the curlers and left,' but he did not know where she went.

''Q. By the way, did you see these curlers? A. Yes, I saw the curlers.

''Q. Where were they at the time you saw them? A. They were in the kitchen. * * *

''Q. Did you have any further conversation with Buddy at that time? A. Yes, I asked Buddy if he were there all day, and he said he'd been out part of the day hunting Mrs. Willard; and, in fact, he said all day, about all day he had been hunting Mrs. Willard. And I made the statement that we were not called—she was not officially reported missing until three o'clock. Buddy stated that he was out long before then and mentioned 11:30.

''Q. You mean, mentioned 11:30? A. Mentioned that he had been hunting her.

''Q. Since 11:30? A. Since about 11:30.

''Q. All right. A. At the time, I believe Mrs. Whittington stated she couldn't understand. Buddy had been—

had never been left alone more than an hour at a time until that particular day. Of course, she told us that Buddy was supposed to have gone to school that morning, and that he didn't go to school, he stated, because he was sick. And he helped hunt then and he helped me in the afternoon, I'd say approximately four o'clock when he ran into the boys.

[No objection was made to the statements of Mrs. Whittington.]

"Q. Did Buddy say what he did after they [his parents] left? A. Why, Buddy stated he went in and lay down after they left and turned on his record player.

"Q. And he told you he did not go to school because he was ill? A. Because he was ill."

Mr. Phillips testified further that he checked out the alibis of Herman Willard, Jack Willard and Dick Willard, and all were at work. No objection was made to this testimony. At one point Herman Willard testified he was back home at 8 a. m. but later said this testimony was in error, that he sometimes returned home but had not done so on the 29th.

Three garbagemen had picked up garbage along the street at about 7 a. m.

The decedent's dog was found along the railroad with his rope chewed.

Mr. William Rutherford, Probation Officer for the Juvenile Court, testified, that on the evening of July 29 he had conversations with Mr. and Mrs. Whittington and Buddy at the Whittington home, a part of which were as follows:

"In talking with Buddy he told me got up that morning and dressed, and was going to go to school; but that after his parents left, he felt ill and didn't go to school. * * *

"He said he had a stomach ache.

"I asked him if he'd seen Mrs. Willard that day, and he told me that he had. That sometime about eight o'clock, she came to the door to return some curlers that his mother had loaned her, or used in fixing Mrs. Willard's hair. * * * Said she came to the rear door * * * he got up and went to

the door.. She handed him the curlers and he laid them there on the chair, I believe, or on the table * * *. And she turned and walked away. He said he didn't know which way she went, that he went back and lay down on the bed * * *. I asked Buddy if he had any idea of how Mrs. Willard's body got under the bed and he said he didn't know anything about it. I asked him if he had seen anybody else around the neighborhood that day, if there had been anybody come to the door, if there was anybody in the house; he said he hadn't seen anybody.

"I asked him if he'd left the house in the morning, and he said he'd left sometime close to noon. He didn't know exactly what time it was. He thought it was sometime right after eleven o'clock but he wasn't sure. He said he left after a lady came who was a sister of Mrs. Willard and told him that Mrs. Willard was missing. Then, I think he said he changed his clothes and went to the berry patch to look for Mrs. Willard."

Orville A. Whittington, the father, testified:

"Q. Do you know on the day in question, the 29th of July, if Buddy left the house that morning? A. Only what he said.

"Q. And what did he say with reference to that? A. He said he was over at Kerns', that's over on the other corner. That would be three lots down. He goes back in the alley and goes up. It's the second house, would be the third one, there's an empty lot right there. It's the second house up to the corner.

"Q. When did he tell you left the house that morning, does he know? Do you know? A. No. He didn't state no specific time he left, but he was there; and he was back in the back yard with his B-B gun, he said, at the berry patch.

"Q. Now with reference to the Kerns' property and in that berry patch, could the back door of your house be seen from either of these two locations? A. No.

"Q. What are the obstructions? A. The garage sets there, and there's a pine tree at the corner of the garage.

And that's all you can see just up the side and straight to the back.

"Q. So that there would be a period of time then when the back door would not be in view of Buddy during that morning according to what he told you? A. Yes, sir."

Buddy Lynn Whittington did not testify.

There was testimony that the mattress and springs had been removed and the body placed rather than shoved under the bed. Pictures were taken before the body was moved and are in evidence. Decedent's glasses, hair net, shoes, and lower dentures were beside the body under the bed.

Based upon medical examination and the autopsy, the medical testimony was that Mrs. Willard's death was homicide by manual strangulation with a soft object, probably by hands or an arm placed around her neck from behind. Her dress was pulled up, but medical examination showed no evidence of sexual attack. The doctor who examined the body at about 8:45 p. m. gave his opinion that death had occurred approximately twelve hours earlier, but eleven hours or over, during which time she had been in the same position under the bed as when the body was found. There were some broken ribs.

There was an abundance of evidence as to Buddy Lynn Whittington's good character and reputation prior to July 29. He was regular in attendance at school, church, Sunday school and youth groups. He had been obedient at home and at school and subjected himself to the reasonable control of both his parents and teachers. Except for a finding that he was delinquent for having unlawfully killed Mrs. Willard, there is no other evidence upon which to base a finding of juvenile delinquency.

While one must read the entire bill of exceptions to gain the complete story, we have tried to set forth the pertinent parts much more in detail than usual, in order to include an accurate portrayal of the factual situation as a part of this opinion.

At the close of the hearing held on September 2 to de-

termine whether Buddy Lynn Whittington was a delinquent child as alleged, the Juvenile Court Judge, as shown by the bill of exceptions, after overruling a motion to dismiss the complaint, said:

"The court finds that there has been a crime committed here, that there has been a homicide committed on this alleged victim; and the court finds that there is probable cause to believe that this young defendant may have done this act, which, if done by an adult, would be a felony. And, at this time, it is the order of the court that the boy be examined, physical and mental examination be made of such child, by the Bureau of Juvenile Research, called the Diagnostic Center of the Youth Commission."

Thereafter, in accordance with further verbal instructions from the Judge, the following journal entry was signed and recorded:

"On the 2nd day of September, 1966, appeared E. Raymond Morehart and S. Farrell Jackson, Prosecuting Attorneys on behalf of the state of Ohio: also appeared Buddy Lynn Whittington, an alleged delinquent child, with his parents, O. A. Whittington and Ollie Whittington, father and mother, and his attorneys, Judson C. Kistler and Jack Supman.

"The said Buddy Lynn Whittington, a minor child of the age of 14 years, being brought before the court, this cause came on to be heard on the complaint, and it appearing that all citations and warrants have been served and that all persons interested are now before the court, and the court having heard all of the evidence and being advised in said premises, finds that said Buddy Lynn Whittington is a minor under the age of eighteen, fourteen years of age, and is a delinquent child as set forth in the complaint, and that said Buddy Lynn Whittington has committed an act which would be a felony if committed by an adult.

"It is therefore ordered by the court, pursuant to Section 2151.26 of the Revised Code of the state of Ohio, that William Rutherford, the Juvenile Probation Officer, make a full investigation herein and report the same to this court.

It is further ordered that said Buddy Lynn Whittington, a delinquent child, be committed to the Juvenile Diagnostic Center of the Ohio Youth Commission for a complete mental and physical examination, the results of which are to be forwarded to this court. And this cause is continued pending investigation and the findings of the mental and physical examination. Exceptions saved to defendant.''

Buddy's counsel did not approve the entry. Within twenty days, notice of appeal to this court was filed from that judgment and, particularly, from the finding therein that Buddy is a delinquent child as set forth in the complaint. The appeal is on questions of law.

Section 2501.02, Revised Code, provides, in part, that the Court of Appeals has jurisdiction:

''Upon an appeal upon questions of law to review, affirm, modify, set aside or reverse judgments or final orders of courts of record inferior to the Court of Appeals within the district, *including the finding, order or judgment of a Juvenile Court that a child is delinquent, neglected or dependent*, for prejudicial error committed by such lower court[.]'' (Emphasis added.)

Section 2151.02, Revised Code, provides, in part, that:

''As used in Sections 2151.01 to 2151.54, inclusive, of the Revised Code, 'delinquent child' includes any child:

''(A) Who violates any law of this state * * *.''

Section 2151.26, Revised Code, provides:

''In any case involving a delinquent child under Sections 2151.01 to 2151.54, inclusive, of the Revised Code, who has committed an act which could be a felony if committed by an adult, the juvenile judge, after full investigation and after mental and physical examination of such child has been made by the Bureau of Juvenile Research, or by some other public or private agency, or by a person qualified to make such examination, may order that such child enter into a recognizance with good and sufficient surety, subject to approval of the judge, for his appearance before the Court of Common Pleas at the next term thereof, for such disposition as the Court of Common Pleas is authorized to make for a like act committed by an adult;

or the judge may exercise the other powers conferred in such sections in disposing of such case.''

If such minor were to be bound over to the Common Pleas Court under the foregoing section, he would immediately become entitled to all the protections afforded an adult. He would at the same time lose the protection afforded a juvenile under the Juvenile Code and, if indicted by a grand jury for unlawfully, purposely and maliciously killing another, contrary to Section 2901.05 of the Revised Code and found guilty beyond a reasonable doubt, he would, likewise as an adult, be subjected to a sentence of imprisonment for life.

On the other hand, when the jurisdiction of the Juvenile Court is not relinquished and a child is not charged, tried, convicted or imprisoned for the crime of unlawfully, purposely and maliciously killing another contrary to the criminal statutes of Ohio but is retained before the Juvenile Court to determine whether by his act or acts he has become a delinquent child, the purpose is not to punish him for crime but to determine whether he is a delinquent child and, if so, the extent to which the state is warranted in making provisions for his custody, and his welfare, in which case, under the provisions of Section 2151.38, Revised Code, the orders are temporary and continue only until terminated or modified, or until a child attains the age of 21 years. See Sections 2151.35 and 2151.38, Revised Code.

The value of the rights afforded a child by a Juvenile Code has been recognized by the Supreme Court of the United States as recently as March 21, 1966. See *Kent* v. *United States*, 383 U. S. 541, 16 L. Ed. 2d 84, 86 S. Ct. 1045, paragraphs ten and fifteen of the S. Ct. Reporter headnotes:

''10. District of Columbia Juvenile Court Act permitting waiver of Juvenile Court's jurisdiction over child did not authorize court, in total disregard of motion for hearing filed by counsel and without any hearing or statement or reasons, to decide that a 16-year-old minor should be taken from the receiving home for children and transferred to jail along with housebreaking, robbery and rape,

be exposed to the possibility of a death sentence instead of treatment for a maximum, in the particular case, of five years, until he was 21.''

"15. The District of Columbia Juvenile Court's waiver of jurisdiction over 16-year-old defendant charged with housebreaking, robbery and rape was a critically important action determining vitally important statutory rights of juvenile.''

Running through all the cases, we find the common complaint of one who is treated as a juvenile that he is being deprived of the constitutional rights of an adult charged with crime and, vice versa, of the child as to whom jurisdiction of the Juvenile Court has been relinquished complaining that he has been deprived of his valuable statutory rights under the Juvenile Code.

In *Cope* v. *Campbell*, 175 Ohio St. 475, the Supreme Court held that proceedings in the Juvenile Court are civil in nature and not criminal; that Section 2151.35, Revised Code, which provides for disposition of juvenile cases, implies protection for the minor and not punishment; and, further, that Section 10, Article I of the Ohio Constitution, and the Fifth and Sixth Amendments to the United States Constitution, being applicable only to the rights of accused persons charged with criminal offenses, do not apply.

In the opinion, at page 477, the court, through Griffith, J., said:

"The hearing in the Juvenile Court is upon the status of a minor child, in the nature of guardianship, and this is so even though the minor child is over 16 years of age and commits an act which, if committed by an adult, would constitute a felony. The Legislature by this act clearly is not inclined to brand the appellant with a mark of infamy or to set a mark of disgrace upon him. It is for the purpose of correction and rehabilitation and not for punishment.''

In the opinion, the Supreme Court further stated that there had been no violation of the Fourteenth Amendment to the United States Constitution. Also, see, *Ex parte Januszewski*, 196 F. 123, decided by the U. S. Circuit Court,

S. D., Ohio, and *Pee* v. *United States*, 274 F. 2d 556. Further, see *Prescott* v. *State*, 19 Ohio St. 184, in which a minor 14 years of age burned a barn but was neither indicted nor tried by a jury, where the Supreme Court, in the opinion at page 187, said:

"The provisions referred to in our state Constitution relate to the preservation of the right of trial by jury, and to the rights of accused in criminal prosecutions. We do not regard this case as coming within the operation of either of those provisions. It is neither a criminal prosecution, nor a proceeding according to the court of the common law, in which the right to a trial by jury is guaranteed.

"The proceeding is purely statutory; and the commitment in cases like the present, is not designed as a punishment for crime, but to place minors of the description, and for the causes specified in the statute, under the guardianship of the public authorities named, for proper care and discipline, until they are reformed, or arrive at the age of majority. * * *."

Likewise, in the case of *Wissenburg* v. *Bradley, Judge*, 209 Iowa, 813, 229 N. W. 205, 67 A. L. R. 1075, appears the following comment:

"The appellant in the instant case is not being tried in this proceeding for any crime. The action is, in a sense, a special proceeding provided by statute, wherein the state, by virtue of its authority as *parens patriae*, takes jurisdiction of the incorrigible child, and commits it, not to jail for punishment, but to a reformatory, for its care, education, and training. That such a statute and such a proceeding, without a trial by jury, does not violate either the federal or the state constitutional provisions, has been repeatedly held."

It has been argued that, although this 14-year-old boy has not been charged with criminal responsibility under the criminal statutes of Ohio, the finding that he is a delinquent as defined by the Juvenile Code is dependent upon a finding that he has violated the specific law of this state alleged in the complaint, which if violated by an adult would be a crime, and that, therefore, the burden of proof must be

beyond a reasonable doubt. The answer is that he is not charged with the crime or with the consequences imposed upon one who is so charged and found guilty. If, under the Juvenile Code, a child is determined to be dependent, neglected or delinquent, the Juvenile Court may place such child on probation or assume custody for the best welfare of the child in the manner provided. The further argument is then made that, without trial for the specific crime upon which the finding of delinquency is dependent, the juvenile is left with the stigma of guilt in the eyes of the public for a crime which he may or may not have committed. The answer to this is one of educating the public to the end that such a misconception is removed. The public must understand that a child found to be a delinquent for having violated a law of this state has not been tried as a criminal under the criminal statutes and, therefore, must not be considered as having committed a crime. He has not been afforded the right of jury trial or other rights which one charged with crime would receive. Neither has he been found guilty beyond a reasonable doubt. He has only been found to be a delinquent under proceedings as authorized by the Juvenile Code by which he is afforded valuable rights not provided for an adult.

The proceeding being civil in nature and not criminal, a preponderance of the evidence is sufficient to warrant a determination that a minor is a delinquent, even though such determination involves a finding that a criminal statute has been violated by such minor. See *State* v. *Shardell*, 107 Ohio App. 338.

If some day a juvenile alleged to be a delinquent when the allegation of delinquency is dependent upon violation of law becomes afforded the same constitutional rights as an adult, it is likely that he will at the same time lose valuable rights now afforded him as a child, as is the case when, under Section 2151.26, Revised Code, *supra*, the Juvenile Court relinquishes jurisdiction and places a juvenile under recognizance to appear before the Common Pleas Court. At present, a 14-year-old juvenile found to be delinquent for having violated a law of this state is subjected

to no loss of liberty other than that to which a juvenile found delinquent for any other cause may be subjected; therefore, his rights as a delinquent cannot be distinguished on this basis from those of any other delinquent.

Among the authorities which we have cited, the case of *Cope* v. *Campbell*, 175 Ohio St. 475, is *stare decisis*, as to many of the issues herein.

The evidence contained in the record fails to disclose any thorough investigation by officials toward eliminating the possibility that Mrs. Gladys Willard may have been killed by some other person.

Buddy Lynn Whittington having been tried by the Juvenile Court as an alleged delinquent and not under the criminal statutes, and the burden of proof being by a preponderance of the evidence, we do not find the judgment of the Juvenile Court finding Buddy to be a delinquent child to be either against the manifest weight of the evidence or contrary to law. We find no violation of his constitutional rights and no error prejudicial to him. Neither do we find the Juvenile Code to be unconstitutional. Each of the assigned errors is overruled, and the judgment is affirmed, with this cause to be remanded to the Juvenile Court for further proceedings according to law.

*Judgment affirmed.*

McLAUGHLIN and VAN NOSTRAN, JJ., concur.