# IN RE JOHNSON

[No. 303, September Term, 1968.]

*Decided July 2, 1969.*

518

Appeal from the Circuit Court for Prince George's County (MATHIAS, Robert B., J.).

The cause was argued before HAMMOND, C. J., and MARBURY, McWILLIAMS, FINAN and SINGLEY, JJ.

*John C. Joyce,* with whom were *Duckett, Orem, Christie & Beckett* on the brief, for appellant.

*Edward F. Borgerding, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, John J. Garrity, Assistant Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County* and *James E. Fannon, Jr., Assistant State's Attorney for Prince George's County,* on the brief, for the State of Maryland.

SINGLEY, J., delivered the opinion of the Court.

This appeal challenges the constitutionality of Maryland Code (1957, 1966 Repl. Vol.) Art. 26 §§ 51-71A, 91-101 (the Act) which creates a system of juvenile courts for the State of Maryland (other than Baltimore City and Montgomery County)[1] on the sole ground that the Act makes no provision for a jury trial.

On 6 October 1967, Erwin J. Zmarzly, a special police officer, was attacked by some 14 youths on a parking lot adjacent to a Giant Food Store in Hyattsville, Maryland. Zmarzly filed a petition in the Circuit Court for Prince George's County, sitting as a juvenile court, against Thomas E. Johnson, then 14 years old, and three other boys. The petition simply alleged that Johnson was a "delinquent", "in need of care and treatment" for the reason that Johnson "Did strike and kick the complainant about the head and body." At a preliminary hearing before the master, Johnson was advised of his right to be represented by counsel, and counsel was appointed.

On 8 December, the matter again came on for hearing. Zmarzly testified that he noticed Mr. Johnson was on his right and was kicking him in the ribs. Johnson admitted that he was at the scene, but denied striking Zmarzly at any time. Mutchler, one of the other respondents, testified that Johnson was at the scene but that Johnson did nothing but watch the fight. At the conclusion of the hearing, the master recommended that Johnson be found a delinquent and that final disposition be withheld, subject to further order of court. Johnson filed exceptions to the master's report, and filed a motion for a jury trial which was denied prior to the hearing de novo in the circuit court and again at the hearing. From orders denying the motion for jury trial and placing Johnson on probation for an indefinite period of time, this appeal was taken.

---

1. For which separate provision is made for Baltimore City by Baltimore City Charter and Public Local Laws (Flack, 1949) §§ 239-257 and for Montgomery County by Code, Art. 26 §§ 72-90.

Maryland Constitution (1867), Declaration of Rights, Art. 5 provides:

> "That the Inhabitants of Maryland are entitled to the Common Law of England, and the trial by Jury, according to the course of that Law, and to the benefit of such of the English statutes as existed on the Fourth Day of July, seventeen hundred and seventy-six; and which, by experience, have been found applicable to their local and other circumstances, and have been introduced, used and practiced by the Courts of Law or Equity; * * *."

Art. 21 adds:

> "that in all criminal prosecutions, every man hath a right * * * to a speedy trial by an impartial jury * * *."

The Sixth Amendment to the Constitution of the United States (Art. VI, Bill of Rights) provides:

> "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, * * *."

and the Fourteenth Amendment, § 1 adds:

> "* * * nor shall any State deprive any person of life, liberty, or property, without due process of law; * * *."

Johnson's court appointed counsel urged, with commendable earnestness in argument before us, and again in a brief which reflects his careful research, that the question which he raises has been foreshadowed by the decisions of the United States Supreme Court in *Duncan v. Louisiana*, 391 U. S. 145, 88 S. Ct. 1444, 20 L.Ed.2d 491 (1968) which overruled *Palko v. Connecticut*, 302

U. S. 319, 58 S. Ct. 149, 82 L.Ed. 288 (1937) and held that the Sixth Amendment guaranty of trial by jury is binding on the states in serious offenses in the light of *In re Gault,* 387 U. S. 1, 87 S. Ct. 1428, 18 L.Ed.2d 527 (1967), holding that the Fourteenth Amendment requirement of due process is applicable to juvenile proceedings. The State argues with equal force that the Maryland Constitution offers no guaranty of a jury trial in juvenile cases, which by our statute are civil proceedings and not criminal prosecutions, and that acceptance of Johnson's contention would call for an unwarranted extension of *Duncan* and *Gault.* The resolution of the issue is not without difficulty.

Until the beginning of this century, Maryland made no distinction in regard to the manner in which criminal offenders, whether they be adults or minors, were tried. All persons, regardless of age, had an absolute right to a jury trial for all but petty offenses. Maryland Constitution, Declaration of Rights, Art. 5, Art. 21; *Danner v. State,* 89 Md. 220, 42 A. 965 (1889) ; *In re Glenn,* 54 Md. 572 (1880).

> "At common law, children were treated as persons. Children under the age of seven, it was held, were incapable of criminal intent and therefore could not be prosecuted for offenses. Children above that age were treated as adults. They were given the same legal protections and the same punishments as adults. This system prevailed, with various modifications, in this country until the early part of the twentieth century. The constitutional guarantees were equally applicable to juvenile offenders and to adults. But then, a tidal wave of reform, put in motion by such persons as Judge Julian Mack and the leaders of the Jane Addams School, resulted in a national outcry against the resulting barbarism, as it appeared to them to be, of treating children and juveniles the same as

adults. So, in all the jurisdictions under the American flag, separate systems of courts and separate sets of principles were devised for juveniles, usually including those up to eighteen years of age." Fortas, *Equal Rights — For Whom?* 42 N.Y.U. L.Rev. 401 (1967) at 405-06.

An early example of the "barbarism" to which Mr. Justice Fortas refers can be found in *State v. Guild*, 10 N.-J.L. (5 Halst.) 163, 18 Am. Dec. 404 (S. Ct., 1828) where the defendant, a 12 year old boy, was convicted of murder on his own uncorroborated confession and hanged.

The reform movement brought about the enactment of special statutory provisions for the handling of juvenile offenders. Illinois, which adopted its Juvenile Court Act in 1899, and was the first to embrace the reform, was followed by some 30 states within six years, and ultimately by all of the American states. The laws shared a common philosophy: [2] for the adversary system, there was substituted a sociologically oriented, completely informal proceeding, which had as its underlying concept the protection of the juvenile. Judges thought not in terms of guilt, but of the child's need for protection or rehabilitation, under an extension of the doctrine of *parens patriae*, which had theretofore been invoked only in cases involving property rights or support. No formal criminal charges were laid, rules of evidence were relaxed, psychiatric and psychological assistance was sought; many proceedings were not open to the public, and wide flexibility was allowed in the adoption of corrective measures.

Such a system has developed in Maryland, commencing with the first tentative step toward reform taken by the passage of Ch. 611 of the Laws of 1902, which authorized the appointment in Baltimore City of a "Magistrate for Juvenile Causes" who "shall have exclusive jurisdiction

---

2. See Lou, *Juvenile Courts in the United States* (1927) at 219; Mack, *The Juvenile Court*, 23 Harv. L. Rev. 104 (1909).

of all cases of trial, or commitment for trial, or of commitment to any reformatory or other institution, of all minors under sixteen years of age * * *," and provided for the appointment of *unpaid* probation officers. Under present law, original jurisdiction over all juveniles less than 18 years of age is vested in judges of the several circuit courts of the counties, sitting as juvenile courts, except in instances where juveniles commit an act punishable by death or life imprisonment, the Act, § 52 (e), *Bean v. State*, 234 Md. 432, 199 A. 2d 773 (1964), on the one hand, or violate certain traffic laws, § 54, on the other. The Act, § 54, provides that the petition which initiates the proceeding must charge that the juvenile is a dependent child, a delinquent child, a neglected child, or a feeble-minded child. § 61 allows wide latitude in the adoption of corrective measures. In its discretion, the juvenile court, under § 54, may waive jurisdiction if the child is charged with the commission of acts which would amount to a felony or misdemeanor if committed by an adult, so that the offender may be tried in the criminal courts. *Superintendent of Md. State Reformatory for Males v. Calman*, 203 Md. 414, 101 A. 2d 207 (1953). Experience has shown that such a waiver is seldom prayed by the offender, but nearly always granted, if requested. By way of analogy, in Baltimore City, where the statute, § 242 Charter and Public Local Laws (Flack, 1949) gives the parent or guardian the right to elect a trial by jury,[3] the election is virtually never made.[4] The proceedings of a juvenile court are not criminal in nature and its dispositions are not punishment for crime.[5] § 61 (2); *In re*

3. Since 1943, the Supreme Bench of Baltimore City has provided by Rule 911 that "* * * any adult brought before the [juvenile] court on a charge, and any child charged with the commission of an act or acts which would amount to a misdemeanor or felony if committed by an adult, shall be entitled to elect whether his case shall be tried by jury. * * *"

4. Moylan, *Comments on the Juvenile Court*, 25 Md. L. Rev. 310, 315 (1965) says that 54,000 cases had been tried in 20 years by the Division of Juvenile Causes of the Circuit Court of Baltimore City, and without a jury trial being requested in any case. Since 1965, the election has been made in several cases.

5. See Annotation, 100 A.L.R.2d 1241-43 for cases from other

*Cromwell,* 232 Md. 409, 194 A. 2d 88 (1963). While proceedings are informal, § 60, the rules of practice, of procedure, of evidence, and standards of fairness must be observed. *In re Fletcher,* 251 Md. 520, 248 A. 2d 364 (1968) ; *In re Cromwell, supra.*

In spite of the time, effort and money which have been expended on the development of mechanisms for the handling of juvenile causes, a wave of disenchantment has been developing for more than a decade—the result of public awareness that the increase in the number of juvenile offenses has been meteoric; [6] that the pattern of recidivism among juvenile offenders seems almost endemic,[7] and that there is substantial opinion that major revisions of the system are in order.[8]

In 1966, in *Kent v. United States,* 383 U. S. 541, 86 S. Ct. 1045, 16 L.Ed.2d 84, for the first time the Supreme Court took the opportunity to pass on the legality of juvenile court procedures. In *Kent,* the Court vacated an order of the District of Columbia Juvenile Court which had waived jurisdiction without granting a hearing or stating reasons. *See* Paulsen, *Kent v. United States: The Constitutional Context of Juvenile Cases,* Supreme Court Rev. (1966) 147.

It was against this background that *In re Gault, supra,* was decided. As we read the majority opinion in *Gault,* however, we realize that what was not decided is quite as significant as what was decided. What *Gault* did, in essence, was to hold that the Fourteenth Amendment standards of due process are applicable to juvenile proceedings. What the majority did not do was to say that *all* of the guarantees of the Bill of Rights need neces-

jurisdictions holding that since juvenile proceedings are not criminal in nature, a jury trial cannot be had as a matter of right in the absence of a statutory provision.

6. U.S. Dept. of Health, Education and Welfare, Children's Bureau, Juvenile Court Statistics at 1 (1965).

7. Report of President's Commission on Law Enforcement and Administration of Justice, Juvenile Delinquency and Youth Crime (1967) at 1.

8. *See, for example,* Antieau, *Constitutional Rights in Juvenile Courts,* 46 Cornell L.Q. 387 (1961).

sarily be applicable. Paulsen, *Constitutional Domestication of the Juvenile Court,* Supreme Court Rev. (1967) 233 at 246.

Specific approval was given by the majority to the processing and treatment of juveniles separately from adults; to classifying a juvenile defender as a delinquent, rather than charging him as a criminal; to statutory provisions which stipulated that the adjudication of a child as a delinquent shall constitute neither a civil disability nor a disqualification for civil service appointment; to provisions intended to keep juvenile records confidential, and to the practice of conducting proceedings in an informal manner, all so long as the essentials of due process — fairness, impartiality and orderliness — are observed. *Gault* concludes:

> "In view of [the power of the juvenile court to commit] it would be extraordinary if our Constitution did not require the procedural regularity and the exercise of care implied in the phrase 'due process.' Under our Constitution, the condition of being a boy does not justify a kangaroo court. The traditional ideas of Juvenile Court procedure, indeed, contemplated that time would be available and care would be used to establish precisely what the juvenile did and why he did it—was it a prank of adolescence or a brutal act threatening serious consequences to himself or society unless corrected?" 387 U. S. at 27, 28.

In *Gault,* a 15 year old juvenile offender had been committed to custody for six years for an offense which, were he an adult, would have been punishable by a fine of from $5.00 to $50.00 *or* by imprisonment for not more than two months. The proceedings were tainted by a failure to notify the parents of the juvenile when he was taken into custody, to advise them of the charges, to inform the juvenile of his right to have counsel, of his privilege against self-incrimination, and of his right to be con-

fronted by and to be accorded an opportunity to cross-examine the accusing witnesses, and the failure to provide counsel. It is quite unnecessary to point out that the situation in *Gault* was a far cry from that in the case at bar.

Only in the concurring opinion of Mr. Justice Black, do we find the proposition that the result in *Gault* should not have been grounded on a denial of due process alone, but rather on the broader base that the Bill of Rights' safeguards, made applicable to the states by the Fourteenth Amendment, apply to juvenile proceedings. Paulsen, Supreme Court Rev. (1967), *supra*, at 247. Such a rationale would import the guarantee of trial by jury, which, it is interesting to note, was not mentioned by Justice Black. If this is a logical corollary, it would indeed, as his concurring opinion suggests, strike "a well-nigh fatal blow to much that is unique about the juvenile courts in the Nation."

We have endeavored to review the cases decided since *Gault* which deal with the question of the right to a jury trial in juvenile proceedings. *Peyton v. Nord,* 78 N. M. 717, 437 P. 2d 716 (1968), while holding that a jury trial was guaranteed by the New Mexico Constitution, read *Gault* to mean that the right was similarly ordained by the Sixth Amendment to the United States Constitution. In *DeBacker v. Brainard,* 183 Neb. 461, 161 N.W.2d 508 (1968), the majority of the Supreme Court of Nebraska concluded that a statute depriving juveniles of a jury trial in a juvenile proceeding was unconstitutional in the light of *Gault,* yet the statute was upheld because more than a majority of the court was required to declare it unconstitutional. *Nieves v. United States,* 280 F. Supp. 994 (S. D. N. Y. 1968) relied on *Gault* in support of a holding that the provisions of the Federal Juvenile Delinquency Act were violative of the Sixth Amendment because they were viewed as inviting a coercive waiver of jury trial. *See also, In re Rindell* (Family Court, Providence, R.I., 1968) 2 Cr. L. 3121.

A contrary result has been reached in other cases: *Commonwealth v. Johnson*, 211 Pa. Super. 62, 234 A. 2d 9 (1967); *Dryden v. Commonwealth*, 435 S.W.2d 457 (Ct. App. Ky., 1968); *People v. "Y.O. 2404"*, 57 Misc. 2d 30, 291 N.Y.S.2d 510 (S. Ct. 1968); *People v. Anonymous*, 56 Misc. 2d 725, 289 N.Y.S.2d 782 (S. Ct. 1968); *Estes v. Hopp*, 73 Wash. 2d 263, 438 P. 2d 205 (1968); *see also, In re Whittington*, 13 Ohio App. 2d 11, 233 N.E.2d 333; *cert. granted* 389 U. S. 819, 88 S. Ct. 112, 19 L.Ed.2d 69 (1967), remanded per curiam 391 U. S. 341, 88 S. Ct. 1507, 20 L.Ed.2d 625 (1968); *Saunders v. Lupiano*, 30 A.D.2d 803, 292 N.Y.S.2d 44 (S. Ct. App. Div. 1968).

Of the latter group of cases, we are impressed by the reasoning in *Johnson* and *Dryden*. In *Johnson*, the Superior Court of Pennsylvania analyzed the opinion in *Gault*:

"Careful analysis of the *Gault* opinion, however, discloses no basis for such dire predictions or sweeping statements [*i.e.*, that "the juvenile court laws had been emasculated, if not fully destroyed"]. We find in *Gault* an opinion carefully limited in scope. The Court held, in essence, that the hearing at which the juvenile is adjudged delinquent must comport with the essential requirements of procedural due process imposed upon the states by the fourteenth amendment of the Constitution. Specifically, the Court held that the juvenile must receive notice of the charges, right to counsel, right of confrontation and cross-examination, and the protection against self-incrimination. The ultimate basis for this decision was that the '[f]ailure to observe the fundamental requirements of due process has resulted in instances which might have been avoided, of unfairness to individuals and inadequate or inaccurate findings of fact and unfortunate prescriptions of remedy. * * *

It is these instruments of due process which enhance the possibility that truth will emerge from the confrontation of opposing versions and conflicting data.' (387 U. S. pp. 19-21, 87 S. Ct. p. 1439).

"At no point in its opinion, however, does the Court suggest that its conclusion extends to every aspect of a juvenile court proceedings. Indeed, it takes great pains to emphasize that, 'We do not in this opinion consider the impact of these constitutional provisions upon the totality of the relationship of the juvenile and the state. We do not even consider the entire process relating to juvenile "delinquents." For example, we are not here concerned with the procedure or constitutional rights applicable to the pre-judicial stages of the juvenile process, nor do we direct our attention to the post-adjudicative or dispositional process. * * * We consider only the problems presented to us by this case. These relate to the proceedings by which a determination is made as to whether a juvenile is a "delinquent" as a result of the alleged misconduct on his part with the consequence that he may be committed to a state institution.' (p. 13, 87 S. Ct. p. 1436).

"The Court further hastens to point out that no inference should be drawn from its opinion that juveniles must be treated exactly as are adults in criminal proceedings. Quoting from its earlier opinion in Kent v. United States, 383 U. S. 541, 562, 86 S. Ct. 1045, 16 L.Ed.2d 84 (1966), it stated: ' "We do not mean * * * to indicate that the hearing to be held must conform with all of the requirements of a criminal trial or even of the usual administrative hearing; but we do hold that the hearing must measure up to the essentials of due process and fair treatment." We reiterate this view, here in connec-

tion with a juvenile court adjudication of "delinquency," as a requirement which is part of the Due Process Clause of the Fourteenth Amendment of our Constitution.' (pp. 30-31, 87 S. Ct. p. 1445).

"Significantly, the Supreme Court in *Kent,* in making the above statement, was apparently relying on the following statement in Pee v. United States, supra, 274 F. 2d p. 559: 'The constitutional safeguards vouchsafed a juvenile in such proceedings are determined from the requirements of due process and fair treatment, and not by the direct application of the clauses of the Constitution which in terms apply to criminal cases. So far as we can ascertain, with few exceptions in a multitude of cases, this has been the ruling of the courts. By the same token the Federal Rules of Criminal Procedure do not apply to these proceedings.'

"Nor does the Supreme Court suggest that the adversary system is now required in juvenile court, but only that Due Process requirements '* * * in contested cases will introduce *some* elements of the adversary [proceeding].' (emphasis ours) (p. 26, 87 S. Ct. p. 1443) Finally the Court does not hold that a juvenile court may not act in a parental manner, but only that this authority must be curbed: 'In Kent v. United States, supra., we stated that the Juvenile Court Judge's exercise of the power of the State as *parens patriae was not unlimited.* We said that "The admonition to function in a 'parental' relationship is not an invitation to procedural arbitrariness.'" (emphasis added) (p. 30, 87 S. Ct. p. 1445).

"In short, those who find in *Gault* the obliteration of any distinctions between the treatment accorded juveniles and adults are reaching a conclusion that is unwarranted. It is clear to us

that the Supreme Court has properly attempted to strike a judicious balance by injecting procedural orderliness into the juvenile court system. It is seeking to reverse the trend whereby 'the child receives the worst of both worlds: * * * he gets neither the protections accorded to adults nor the solicitous care and regentive treatment postulated for children.' (Kent v. United States, supra, 383 U. S. p. 556, 86 S. Ct. p. 1054.) It has not suggested that we discard the flexibility which has long been the hallmark of juvenile courts, but that we temper it with certain procedural safeguards." 234 A. 2d 9, at 14-16

The approach followed by the Kentucky Court of Appeals in *Dryden* was similar:

"Surely if the gravity of what may happen to a defendant in a juvenile proceeding is sufficient to invoke the other constitutional protections we have mentioned, by force of the same reasoning it would seem also to call for the right to a jury trial, which could hardly be classified as a less vital instrument of protection than the others. But that is mere logic and, as Holmes observed, in the course of jurisprudential navigation logic can be a deceptive compass indeed. Both from our own experience and the fine exposition delivered by the Superior Court of Pennsylvania in Commonwealth v. Johnson, id., we are persuaded that *Gault* neither requires the conclusion nor foreshadows a decision by the Supreme Court that the constitutional right to a jury trial applies in a juvenile proceeding."

* * *

"A jury trial, with all the clash and clamor of the adversary system that necessarily goes with it, would certainly invest a juvenile proceeding with the appearance of a criminal trial,

and create in the mind and memory of the child the same effect as if it were. In our opinion there is more to be lost than gained. Certainly we cannot regard a jury as a better, fairer, more accurate fact-finder than a competent and conscientious circuit judge. There may be some judges who do not fit this description, but neither do all juries." 435 S.W.2d 457, at 460-61

In argument before us, counsel for Johnson readily conceded that he was not seeking a jury trial in the usual sense, because this might have been obtained by requesting a waiver, but rather sought a submission of issues of fact for jury determination. Such a mechanism is not without a certain attractiveness, and could some day become a part of our juvenile practice.[9]

The difficulty is that this Court long has recognized that in Maryland "juvenile courts are courts of equity for juvenile causes" having "the power and full right to decide without a jury every question of law and fact which may arise out of the subject matter before it and over which it has jurisdiction, and the trial by issue forms no necessary incident to the proceedings of such court." *Commonwealth of Pennsylvania v. Warren,* 204 Md. 467 at 474, 105 A. 2d 488 (1954). *Compare also, In re Easton,* 214 Md. 176, 189, 133 A. 2d 441 (1957) (jury trial not mandatory in lunacy proceeding) ; *Blizzard v. State,* 218 Md. 384, 147 A. 2d 227 (1958) ; *Sas v. Maryland,* 334 F. 2d 506 (4th Cir. 1964) (nor in defective delinquent proceeding) ; *Sheets v. Hagerstown,* 204 Md. 113, 102 A. 2d 734 (1954) (nor in contempt proceeding). *But compare, Bloom v. Illinois,* 391 U. S. 194, 88 S. Ct. 1477, 20 L.Ed. 2d 522 (1968) (Sixth Amendment guarantees a right to jury trial in case of serious criminal contempt) *with*

9. It should be noted, however, that Ch. 432 of the Laws of 1969, which sets up a uniform system for the trial of juvenile causes in Maryland (excepting, however, Montgomery County), effective 1 July 1969, makes no provision for a juvenile defendant to elect a jury trial as a matter of right.

*Frank v. United States,* 37 U.S.L.W. 4437 (U. S. May 19, 1969).

If the procedure urged on us by Johnson's counsel is to become a part of the trial of juvenile causes, it will have to be provided for by legislative action, and not by the courts, since our Legislature, under the waiver permitted by § 54 of the Act, chose to make alternate provision for a jury trial in traditional form, although admittedly at the court's discretion, and not as a matter of right. It is difficult to conceive of circumstances which would warrant a refusal to waive jurisdiction under § 54, if such a request were made by or in behalf of a juvenile.

*Orders affirmed.*