[Crim. No. 10481.   Second Dist., Div. Two.   Jan. 24, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. GARY WAYNE WALLS, Defendant and Appellant.

Bruce A. Thabit and William Strong for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Gilbert F. Nelson, Deputy Attorney General, for Plaintiff and Respondent.

ROTH, P. J. — Appellant was convicted of involuntary manslaughter (Pen. Code, § 192, subd. 2) after trial to the court without a jury. He appeals from the judgment.

On Tuesday, January 14, 1964, appellant Walls stayed home from his job because of illness. Portions of his apartment being wet from a paint job, he and his wife Ruth Marie were at the home of a Mrs. Bolton, the grandmother of Linnea Provins, the victim of this unfortunate crime. Linnea was 4 years old and was also appellant's niece.

At 2:30 p.m. of the same day appellant and wife decided to return to their apartment and invited Linnea, Linnea's mother, Norma Provins, and Mrs. Bolton, the grandmother, to come and inspect the new paint job. Appellant departed on his motorcycle. His wife, Linnea and Linnea's mother followed in a car. Appellant arrived first, tested the paint to see if it was dry. He then went into his bedroom and put on a holster and gun recently purchased to show it to Linnea's mother.

When the others entered the house Ruth Marie smeared a little paint on the sleeve of her coat from the freshly painted screen door. There was a brief discussion between appellant and his wife concerning methods of removing the paint. Mother and daughter were standing a few feet away from appellant. At this point, appellant drew the gun from the holster. It fired, and a bullet struck Linnea in the head. Police and an ambulance were called. The injury was fatal.

Appellant testified that he had used the gun the previous Sunday, that he had expended all the shells at that time, and that some friends had handled it that day and it appeared to be unloaded. He said he thought the gun was unloaded but had not checked it since Sunday.

The precise events that led up to the shooting were a matter of some dispute. Appellant testified that he wanted to show Norma the gun, so he put on the holster with the gun in it, took off a restraining strap that covered the hammer of the gun, "took it out and snapped it a couple of times and put it back and I held the screen door for them to come in. . . . I told them the paint was wet and the little girl came in first and then her mother came in and stood beside the door and my wife had gotten paint on her coat when she came in. I was looking at it and Norma looked over at it and I turned around and drew the gun out to show it to Norma and that is about all I know about it.''

Respondent presented a taped conversation between appellant and two police officers taken at the police station prior to appellant's arrest. Appellant stated that he "was going to show off to Norma, show her how fast I could draw or something.'' On response to the question by one of the officers ''You think you just pulled it up off of a sudden to let them see the fast draw?'', appellant answered, ''I think that is what happened, . . .''

The tape also contained statements showing that the gun had previously discharged accidentally when appellant had drawn it from the holster in a similar fashion.

Officer Kasper, one of the questioning policemen, stated: "At that time he stated that he drew the revolver from his holster and pointed it at Linnea and the gun went off."

Cross-examination of appellant revealed that the Sunday prior to the day of the shooting, appellant had been practicing his fast draw, and that in handling the gun, the hammer had snapped a few times accidentally. A ballistics expert testified that the fateful gun could not be fired without pulling the trigger.

Appellant contends that the admissions to the police at the police station, introduced by tape, constituted prejudicial error requiring a reversal (*People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]; Cal. Const. art. VI, § 4½.) Respondent argues that the statements were not made during the accusatory stage since appellant was not yet under arrest and that in any event the admissions were not prejudicial. (*People* v. *Hillery,* 62 Cal.2d 692, 712 [44 Cal.Rptr. 30, 401 P.2d 382].)

The record fails to show with certainty that the proceedings were in the accusatory stage when the tape recording was made. (*People* v. *Dorado, supra,* at p. 353; *People* v. *Stewart,* 62 Cal.2d 571, 577 [43 Cal.Rptr. 201, 400 P.2d 97].) On the one hand, it is inferable that the police were confronted with an apparently accidental shooting and were questioning the appellant to determine whether a crime had even been committed. If that were so, the statements made to the police during such an investigatory questioning would be admissible (*People* v. *Katz,* 234 Cal.App.2d 413, 423 [44 Cal. Rptr. 354]; *People* v. *Ford,* 234 Cal.App.2d 480, 506 [44 Cal.Rptr. 556].)

On the other hand, the tape recording presents a formal and regular process of questioning which implies prior questioning on the same material. This interpretation of the record is fortified by the fact that during the early portion of the tape recording appellant was asked "Do you remember how the gun got loaded?", to which appellant replied "No sir, I don't know. That is what I just can't understand about it, I just can't understand how the gun got loaded." One of the questioning officers then reminded appellant, saying: "Remember that you were in Lancaster, and you said you shot up all the shells you had at that time?" This last question indicates that the police had previously questioned appellant sufficiently to trace the gun in order to determine how it got loaded. Whether, in the course of previous ques-

tioning, they had gained sufficient facts to indicate that a crime might have been committed by appellant, is not clear from the record. The fact that a formal arrest had not been made is only one of several criteria. (*People* v. *Furnish*, 63 Cal.2d 511, 516 [47 Cal.Rptr. 387, 407 P.2d 299].)

▋ The question, however, is academic in the instant case, for even if the statements were introduced in violation of the *Dorado* rule, prejudicial error did not result.

The statutory basis for the conviction of appellant is Penal Code, section 192: "Manslaughter is the unlawful killing of a human being, without malice. It is of three kinds: . . . 2. Involuntary— . . . or in the commission of a lawful act which might produce death . . . without due caution and circumspection; . . ." This language, which is hardly illuminating by itself, was given substance in the case of *People* v. *Penny,* 44 Cal.2d 861, 879 [285 P.2d 926]: "The negligence must be aggravated, culpable, gross, or reckless, that is, the conduct of the accused must be such a departure from what would be the conduct of an ordinarily prudent or careful man under the same circumstances as to be incompatible with a proper regard for human life, . . ."

It is well settled that the law regards firearms as dangerous instrumentalities and requires a great degree of care in handling them. Criminal negligence is frequently found in the unintentional killing by a gun. (*People* v. *Searle,* 33 Cal. App. 228, 231 [164 P. 819]; *People* v. *Carmen,* 36 Cal.2d 768, 776 [228 P.2d 281]; *People* v. *Sica,* 76 Cal.App. 648 [245 P. 461]; *People* v. *Freudenberg,* 121 Cal.App.2d 564, 580 [263 P.2d 875]; *People* v. *Tophia,* 167 Cal.App.2d 39, 45 [334 P.2d 133]; 1 Witkin, Cal. Crimes (1963) p. 313; 26 Am.Jur. 300.) In the case at bench, there is sufficient evidence, apart from the alleged illegally obtained admissions to the police, to support the conclusion that appellant did not act with due caution or circumspection within the meaning of Penal Code, section 192, subdivision 2.

The admittedly valid evidence shows that appellant had in the past practiced a fast draw with his gun, and that the previous Sunday the hammer of the gun had slipped from his thumb while he was handling the weapon. The fact that just prior to the shooting appellant had put on his holster and adjusted the gun in it indicated that he intended to do more than merely show the gun to Norma. The evidence further shows that without checking to see if the gun was loaded he drew it from the holster in close proximity to two adults and

a 4-year-old child. Since the gun would not fire without pulling the trigger he must have done just that, and the fact that the bullet eventually struck his niece demonstrates that the weapon was pointed towards her when he drew it and pulled the trigger. We think that such evidence supports a finding that appellant acted so recklessly as to be incompatible with a proper regard for human life. (*People* v. *Penny, supra.*) We think also that even had the improper evidence been excluded "a different verdict would not otherwise have been probable." (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].)

The judgment is affirmed.

Herndon, J., and Fleming, J., concurred.

A petition for a rehearing was denied February 23, 1966.