[Sac. No. 7819. In Bank. Feb. 20, 1969.]

In re DENNIS M., a Person Coming Under the Juvenile Court Law.

WARREN E. THORNTON, as Probation Officer, etc., Plaintiff and Respondent, v. DENNIS M., Defendant and Appellant.

Kenneth M. Wells, Public Defender, and Michael S. Sands, Assistant Public Defender, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, Edsel W. Haws and Raymond M. Momboisse, Deputy Attorneys General, for Plaintiff and Respondent.

MOSK, J.—Dennis M., a juvenile, appeals from a judgment declaring him to be a ward of the court and committing him to the Youth Authority. (Welf. & Inst. Code, §§ 725, 800.) He contends that the record is insufficient to support a finding that he was guilty of involuntary manslaughter, and that his confession was introduced into evidence in violation of the rules laid down in *Miranda* v. *Arizona* (1966) 384 U.S. 436

[16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. We have concluded that the points are not well taken and the judgment should be affirmed.

At the time the events in issue took place, appellant was 15½ years old. On August 18, 1966, appellant and his friend Gilbert took an automobile without the owner's consent. Before abandoning it, appellant stole a .22-caliber revolver from the glove compartment, and Gilbert stole a shotgun from the trunk. About 8:30 p.m. on August 28 appellant called on his 15-year-old girl friend Yolanda. After the two had stood outside her house talking for some 15 minutes, a shot was heard. Yolanda's father rushed out and found his daughter shot in the head, the bullet having entered under her chin. No gun was visible, and no other persons were present. Appellant immediately claimed that the shot had been fired by a passer-by; asking, "You want me to go after him?" appellant mounted his bicycle and appeared to give chase. He returned empty-handed, and when Deputy Sheriff Piper arrived a few minutes later appellant volunteered a detailed description of the incident and the alleged assailant.[1]

At 10:15 p.m. Sheriff's Officers Stamm and Tobler went to Yolanda's house to talk with appellant about the shooting. They had discussed the event with Officer Piper, and believed that appellant had given him a false story. Upon arriving at the scene, Officer Tobler found a .22-caliber revolver in a flower bed of the house next door. The chamber of the weapon contained an empty cartridge.[2] The officers then asked appellant to step outside, showed him the revolver, and advised him of his constitutional rights under the decision of *Miranda* v. *Arizona* (1966) *supra*, 384 U.S. 436. When asked if he wanted to talk about it, appellant acknowledged that he had shot Yolanda. At this point he was arrested and placed in the

---

[1]Appellant specified that the phantom assailant appeared from the space between Yolanda's house and the house next door, shot her as he passed on the sidewalk, and disappeared when he jumped over a fence at the end of the street. Appellant then described him as a Negro male juvenile, 15 or 16 years old, 5 feet 7 inches tall and weighing 125 pounds, wearing a green-and-white striped sweater and dark trousers, with bushy hair and a high, pampadour-type hair style. Appellant also claimed that on the previous night his friends had informed him that a Negro youth "was after him," and that their description matched that of the assailant. As will appear, this entire story was a fabrication.

[2]In an operation the next day a single .22-caliber bullet was removed from Yolanda's brain. The bullet was too mutilated to allow conclusive proof that it had been fired from the gun found by Officer Tobler. Other tests on the gun, however, established that its trigger had a four-pound pull when cocked and in excess of a ten-pound pull on double action, and that it could not have been fired accidentally.

officer's car. He explained that the shooting was an accident, that he had been "playing" with the gun and "I asked her if she wanted to see it. It just went off, I didn't know it was loaded." He further admitted the theft of both the gun and the car with Gilbert.

An hour and a half later appellant was questioned in the sheriff's office by a deputy district attorney, who began by readvising appellant of his *Miranda* rights. Appellant stated he understood, and proceeded to elaborate on his story of an accidental shooting. In substance, he related that after stealing the gun he had loaded it and practiced firing it; that on the evening he visited Yolanda he pulled it out to show her; that he thought he had removed all the bullets while talking with her, but "I didn't know if it was loaded or not"; that he pointed the gun upwards and pulled the trigger twice while hugging Yolanda, and it fired the second time; and that he immediately threw the gun over the fence and told Yolanda's father and Officer Piper the tale of the phantom assailant.

On August 30 a petition was filed in the juvenile court, praying that appellant be adjudged a ward of that court on the ground that he was a "person under the age of twenty-one years who violate[d] any law of this State" (Welf. & Inst. Code, § 602). The violations alleged were that appellant had stolen the .22-caliber revolver and used it to commit an assault with a deadly weapon against Yolanda. She died later the same day. Accordingly, on September 1 a supplemental petition was filed, seeking such an adjudication on the additional ground that appellant was guilty of involuntary manslaughter in the killing of Yolanda; he was also charged at that time with the August 18 theft of the automobile.[3]

At the outset of the hearing, appellant, represented by counsel, admitted the theft of the gun. The above-related evidence was then introduced, and the court found that appellant had committed the three charged violations of law and hence was within the jurisdiction defined by section 602. Judgment was thereafter rendered declaring appellant to be a ward of the court[4] and committing him to the care and custody of the Youth Authority.

---

[3]The charge of assault with a deadly weapon was subsequently dismissed on motion of the probation officer.

[4]The effect of the judgment was actually to *continue* appellant in that status, as he was already a ward by reason of previous adjudications.

## I

The appeal is devoid of merit insofar as it attacks the "jurisdictional" finding. Appellant, represented by counsel, judicially admitted the charge of stealing the .22-caliber revolver. Such a violation of law, standing alone, is sufficient to bring a juvenile within the purview of section 602, and the record discloses that the court so found: in the course of the hearing the court ruled, "Without making any disposition at this time, I'll sustain the petition . . . as to the violation of [Penal Code] Section 484 [i.e., theft of the gun]." Appellant has not challenged the propriety of that ruling; nor, indeed, has he questioned on appeal the finding that he was also guilty of the theft of the car. The juvenile court's finding of jurisdiction over appellant is thus more than adequately supported.

Nevertheless, we recognize that the third stated jurisdictional ground, i.e., that appellant was guilty of manslaughter in the shooting of Yolanda, may have had significant weight in the court's subsequent ruling on disposition. (Welf. & Inst. Code, § 702 et seq.) Accordingly, we consider the merits of appellant's attack on that ground.

We meet at the outset a contention advanced by appellant at oral argument: i.e., that the United States Supreme Court decision in *In re Gault* (1967) 387 U.S. 1 [18 L.Ed.2d 527, 87 S.Ct. 1428], compels the state to establish the facts supporting a charge of juvenile delinquency by the criminal standard of proof "beyond a reasonable doubt." We do not so read *Gault*. It is true, of course, that the decision inaugurated a sweeping constitutional reform of the rights of juveniles in this country. It drew from the teaching of earlier cases the fundamental proposition that "neither the Fourteenth Amendment nor the Bill of Rights is for adults alone" (387 U.S. at p. 13 [18 L.Ed.2d at p. 538]), and laid down specific guidelines for implementing those guarantees in juvenile proceedings. Yet in so doing the court took repeated pains to limit its holding by warning that "We do not in this opinion consider the impact of these constitutional provisions upon the totality of the relationship of the juvenile and the state. We do not even consider the entire process relating to juvenile 'delinquents.' " (*Ibid.*) First, the decision was intended to affect only the adjudicatory stage of juvenile proceedings, and then only when the outcome may be commitment to a state institution. (*Ibid.*) Secondly, the court made it clear that even if the foregoing conditions are met, the Constitution does not require that the full panoply of rights

accorded to an adult accused of crime be erected in the juvenile court. (*Id.* at pp. 27, 30 [18 L.Ed.2d at pp. 546, 547-548].) ▮▮▮ Rather, the opinion (at pp. 30-31 [18 L.Ed.2d at pp. 547-548]) adopts for juvenile court adjudications of delinquency the holding of *Kent v. United States* (1966) 383 U.S. 541, 562 [16 L.Ed.2d 84, 98, 86 S.Ct. 1045], that "the hearing must measure up to the essentials of due process and fair treatment." Those essentials, as the remainder of the opinion spells out, are (1) adequate notice of the charges, (2) assistance of counsel, (3) opportunity for confrontation and cross-examination, and (4) the privilege against self-incrimination. (387 U.S. at pp. 31-57 [18 L.Ed.2d at pp. 548-563].)

Not only is standard or quantum of proof missing from the foregoing itemized list, but the court expressly declined to reach this very issue. In the course of its opinion below, the Arizona court had ruled on the question of the appropriate standard of proof in juvenile cases; referring inter alia to that ruling, the United States Supreme Court stated (387 U.S. at pp. 10-11 [18 L.Ed.2d at pp. 536-537]) that "We emphasize that we indicate no opinion as to whether the decision of that court with respect to such other issues does or does not conflict with requirements of the Federal Constitution." And one year later the court again refrained from deciding the issue.[5]

We infer that at least for the present the Supreme Court has left this matter to the states and the lower federal courts. The results, however, are still highly inconclusive. At least three different formulae have been sanctioned. The great weight of authority holds that in juvenile proceedings the general civil standard of proof by a preponderance of the evidence governs. (See cases collected in Note, 43 A.L.R.2d 1128, 1138-1141.) Some courts, including the Arizona Supreme Court in *Gault* itself, have adopted the special civil standard of proof by "clear and convincing evidence." (See, e.g., *Application of Gault* (1965) 99 Ariz. 181 [407 P.2d 760, 768].) And the few jurisdictions to consider the issue since *Gault* are divided: in Illinois and Texas it has been held that

---

[5]In *In re Whittington* (1967) 13 Ohio App.2d 11 [42 Ohio Ops.2d 39, 233 N.E.2d 333], a 14-year-old youth had been adjudged a delinquent after a finding on a preponderance of the evidence that he had committed second degree murder. In affirming, the Ohio court rejected a contention that the proof of such conduct must be made beyond a reasonable doubt. The United States Supreme Court granted certiorari and heard oral argument, but ultimately chose not to reach the merits; rather, it vacated the judgment and remanded the case for reconsideration in the light of *Gault,* which had been decided in the interim.

the criminal standard of proof beyond a reasonable doubt is now constitutionally compelled in juvenile cases (*In re Urbasek* (1967) 38 Ill.2d 535 [232 N.E.2d 716] ; *Santana* v. *State* (Tex.Civ.App. 1968) 431 S.W.2d 558; see also *United States* v. *Costanzo* (4th Cir. 1968) 395 F.2d 441, 445 [applying the more limited terms of the federal juvenile statute] ; *DeBacker* v. *Brainard* (1968) 183 Neb. 461 [161 N.W.2d 508, 513] [dissenting opinion by four justices; state constitution requires concurrence of five to hold a statute unconstitutional] ), while the District of Columbia Court of Appeals has adhered to its pre-*Gault* adoption of the preponderance of the evidence test (*In re Wylie* (D.C. Mun.App. 1967) 231 A.2d 81, 84).

In California we do not write upon a clean slate. For the first half-century of their existence our juvenile court statutes contained no provision on this topic, and a wide variety of standards of proof was in actual use.[6] In 1957, however, a special commission was created to survey and evaluate the administration of juvenile justice in this state and submit recommendations for legislative action. After three years of field studies, hearings, drafts, and conferences with experts and practitioners alike, the commission filed its report. On the important issue of procedural rules, the commission posited that "The problem in attempting to establish acceptable juvenile court procedures is to attain a working balance between two essential objectives—first, preserving the guarantee of due process to the minor; and second, establishing an informal court atmosphere so that potentially harmful effects of the proceedings are minimized and the minor's receptivity to treatment is encouraged." (Rep. of Governor's Special Study Com. on Juvenile Justice (1960), pt. I, p. 29.) Mindful of both these goals, the commission concluded (at p. 30) that "All of the reasons for employing rules of evidence in other judicial proceedings, e.g., to insure truthful, reliable, and fair testimony, apply with equal force to a hearing on a minor's delinquency or a hearing in which a child may be removed from his family because of parental neglect. . . . On the other hand, the Commission sees no valid reason for requiring the degree of proof customary in criminal cases. It is our opinion that requiring proof of the jurisdictional facts by a

[6]Many trial judges voluntarily applied rules of evidence in contested cases. But both "civil rules" and "relaxed criminal rules" were invoked, and in the latter category approximately one-half of the judges used the reasonable doubt standard and one-half used preponderance of the evidence. (Rep. of Governor's Special Study Com. on Juvenile Justice (1960) pt. II, pp. 9-10.)

preponderance of evidence will sufficiently safeguard the rights of the minor so long as the court scrupulously observes the presumptions of lawful conduct and circumstance until the allegations are actually proven in open hearing.''

Accordingly, the commission recommended that the standard of proof in juvenile court matters be a preponderance of the evidence, and the Legislature so provided. (Stats. 1961, ch. 1616, p. 3482.)[7]

The Legislature, moreover, has been fully responsive to *Gault*. Many of the safeguards required by *Gault* had already been incorporated into our law six years before that decision, as the opinion itself recognizes. (387 U.S. at p. 37 fn. 63 [18 L.Ed.2d at pp. 551-552].) Nevertheless, in its 1967 session the Legislature adopted numerous amendments designed to comply with the entire mandate of *Gault,* by implementing in considerable detail the juvenile's right to notice, to counsel, to confrontation and cross-examination, and his privilege against self-incrimination. (Stats. 1967, chs. 507, 1355, 1356; see generally Gardner, *Gault and California* (1968) 19 Hast.L.J. 527, 532-539.)

Such deliberate acts of the Legislature come before us clothed with a presumption of constitutionality. ''All presumptions and intendments favor the validity of a statute and mere doubt does not afford sufficient reason for a judicial declaration of invalidity. Statutes must be upheld unless their unconstitutionality clearly. positively and unmistakably appears. [Citations.]'' (*Lockheed Aircraft Corp.* v. *Superior Court* (1946) 28 Cal.2d 481, 484 [171 P.2d 21, 166 A.L.R. 701]; accord, *State of California* v. *Industrial Acc. Com.* (1957) 48 Cal.2d 365, 371 [310 P.2d 7]; *In re Davis* (1966) 242 Cal.App.2d 645, 651 [51 Cal.Rptr. 702].) No such showing is here made with regard to the statutory standard of proof in juvenile matters.

In contrast to a number of the fundamental guarantees of Anglo-American criminal law which can trace their sources back to the Magna Carta or even earlier (e.g., *Duncan* v. *Louisiana* (1968) 391 U.S. 145 [20 L.Ed.2d 491, 88 S.Ct. 1444] [right to trial by jury]; *Klopfer* v. *North Carolina*

[7]Now Welfare and Institutions Code section 701, the statute declares in relevant part that ''a preponderance of evidence, legally admissible in the trial of criminal cases, must be adduced to support a finding that the minor is a person described by Section 602, and a preponderance of evidence, legally admissible in the trial of civil cases must be adduced to support a finding that the minor is a person described by Sections 600 or 601.''

454

(1967) 386 U.S. 213 [18 L.Ed.2d 1, 87 S.Ct. 988] [right to speedy trial]), the standard of proof "beyond a reasonable doubt" is a relatively recent development. It appears to have had its origin at the end of the Eighteenth Century, and to have first passed through a variety of differing and tentative formulations. (9 Wigmore, Evidence (3d ed. 1940), p. 317.) Although it is now codified in our statutes (Pen. Code, § 1096), it is not mentioned in either the California or federal Constitutions. For present purposes, however, we may assume that it is part of the due process of law guaranteed in criminal cases by the Fourteenth Amendment. (See *Speiser* v. *Randall* (1958) 357 U.S. 513, 525-526 [2 L.Ed.2d 1460, 1472-1473, 78 S.Ct. 1332].) The question remains, does *Gault* require, by implication, that this element of adult criminal trials be incorporated into our juvenile court law?

Prior to *Gault* it was squarely held that by reason of the fundamental differences in nature and purpose between a criminal prosecution and a juvenile proceeding, the use in the latter of the preponderance of the evidence standard prescribed by Welfare and Institutions Code section 701 does not constitute a violation of either due process or equal protection of the law. (*In re Johnson* (1964) 227 Cal.App.2d 37, 39 [38 Cal.Rptr. 405] ; cf. *In re Castro* (1966) 243 Cal.App.2d 402, 408 [52 Cal.Rptr. 469].) Unless those differences have been obliterated by *Gault,* the *Johnson* holding remains the law of this state. (See, e.g., *In re Jones* (1967) 256 Cal.App.2d 240, 243-244 [63 Cal.Rptr. 758] [post-*Gault* appeal from declaration of wardship based on charge of attempted arson; preponderance of the evidence standard applied without discussion].) We do not deny that *Gault* casts doubt on the traditional *parens patriae* theory, and exposes many defects in its practice; but we also take the high court at its word when it reiterates that under the Constitution the juvenile court hearing need not "conform with all of the requirements of a criminal trial or even of the usual administrative hearing" (387 U.S. at p. 30 [18 L.Ed.2d at p. 548], quoting from *Kent* v. *United States* (1966) *supra,* 383 U.S. 541, 562 [16 L.Ed.2d 84, 97]). Indeed, the opinion is replete with language admonishing that the new rules there laid down should not be taken to spell the end of the juvenile court process per se, and that many of its unique attributes can and should be preserved.[8]

---

[8]". . . the observance of due process standards, intelligently and not ruthlessly administered, will not compel the States to abandon or displace

In a thoughtful decision reviewing the just quoted language of *Gault*, a Pennsylvania appellate court has concluded that "those who find in *Gault* the obliteration of any distinctions between the treatment accorded juveniles and adults are reaching a conclusion that is unwarranted. It is clear to us that the Supreme Court has properly attempted to strike a judicious balance by injecting procedural orderliness into the juvenile court system. . . . It has not suggested that we discard the flexibility which has long been the hallmark of juvenile courts, but that we temper it with certain procedural safeguards. . . . [W]e are in full agreement with the holding of the Supreme Court that the constitutional safeguards of the Fourteenth Amendment guaranteed to adults must similarly be accorded juveniles. It is inconceivable to us, however, that our highest Court attempted, through *Gault*, to undermine the basic philosophy, idealism and purposes of the juvenile court. We believe that the Supreme Court did not lose sight of the humane and beneficial elements of the juvenile court system; it did not ignore the need for each judge to determine the action appropriate in each individual case; it did not intend to convert the juvenile court into a criminal court for young people. Rather, we find that the Supreme Court recognized that juvenile courts, while acting within the constitutional guarantees of due process, must, nonetheless, retain their flexible procedures and techniques." (*Common-*

any of the substantive benefits of the juvenile process." (Fn. omitted; 387 U.S. at p. 21 [18 L.Ed.2d at p. 543].)

"We do not mean . . . to denigrate the juvenile court process or to suggest that there are not aspects of the juvenile system relating to offenders which are valuable. But the features of the juvenile system which its proponents have asserted are of unique benefit will not be impaired by constitutional domestication. For example, the commendable principles relating to the processing and treatment of juveniles separately from adults are in no way involved or affected by the procedural issues under discussion. Further, we are told that one of the important benefits of the special juvenile court procedures is that they avoid classifying the juvenile as a 'criminal.' The juvenile offender is now classed as a 'delinquent.' There is, of course, no reason why this should not continue." (Fn. omitted; *id.* at pp. 22-23 [18 L.Ed.2d at pp. 543-544].)

"Of course, it is not suggested that juvenile court judges should fail appropriately to take account, in their demeanor and conduct, of the emotional and psychological attitude of the juveniles with whom they are confronted. While due process requirements will, in some instances, introduce a degree of order and regularity to juvenile court proceedings to determine delinquency, and in contested cases will introduce *some* elements of the adversary system, nothing will require that the conception of the kindly juvenile judge be replaced by its opposite, . . ." (Italics added; *id.* at pp. 26-27 [18 L.Ed.2d 545-546].)

*wealth* v. *Johnson* (1967) 211 Pa. Super. 62 [234 A.2d 9, 15-17].)

The issue before the Pennsylvania court was whether *Gault* required, by implication, that the right to a jury in adult criminal trials be incorporated into juvenile court law. The court held that it did not, reasoning that "the institution of jury trial in juvenile court, while not materially contributing to the fact-finding function of the court, would seriously limit the court's ability to function in this unique manner, and would result in a sterile procedure which could not vary to meet the needs of delinquent children." (*Id.* at p. 17; accord, *Dryden* v. *Commonwealth* (Ky.App. 1968) 435 S.W.2d 457; *In re Fletcher* (1968) 251 Md. 520 [248 A.2d 364]; *People* v. *3656, 3658, Y.O.* (Sup.Ct. 1968) 289 N.Y.S.2d 782.)

Although the consequences of adopting the reasonable doubt standard in juvenile court would perhaps be less drastic than adopting a jury system, to do so would nevertheless introduce a strong tone of criminality into the proceedings. The high degree of certainty required by the reasonable doubt standard is appropriate in adult criminal prosecutions, where a major goal is corrective confinement of the defendant for the protection of society. But even after *Gault,* as we have seen, juvenile proceedings retain a *sui generis* character: although certain basic rules of due process must be observed, the proceedings are nevertheless conducted for the protection and benefit of the youth in question. In such circumstances, factors other than "moral certainty of guilt" come into play: e.g., the advantages of maintaining a noncriminal atmosphere throughout the hearing, and the need for speedy and individualized rehabilitative services. Indeed, the youth's alleged crime may often be only the latest or most overt symptom of an underlying behavioral or personality disorder which could equally well warrant a declaration of wardship pursuant to other provisions of the code.[9] Thus a determination whether

---

[9]E.g., Welfare and Institutions Code section 600, which provides in part: "Any person under the age of 21 years who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge such person to be a dependent child of the court:

"(a) Who is in need of proper and effective parental care or control and has no parent or guardian, or has no parent or guardian willing to exercise or capable of exercising such care or control, or has no parent or guardian actually exercising such care or control.''

Section 601 provides: "Any person under the age of 21 years who persistently or habitually refuses to obey the reasonable and proper orders or directions of his parents, guardian, custodian or school authorities, or who is beyond the control of such person, or any person who is a habitual truant from school within the meaning of any law of this State, or who

or not the person committed the particular misdeed charged—although the very heart of an adult criminal prosecution—may not in fact be critical to the proper disposition of many juvenile cases. On the contrary, in the latter the best interests of the youth may well be served by a prompt factual decision at a level short of "moral certainty."[10]

In any event, we cannot say that the Legislature plainly exceeded constitutional limits in finding that the benefits of the reasonable doubt standard would be outweighed by the adverse effects of imposing that doctrine of adult criminal law on the essentially remedial proceedings of the juvenile court.[11]

---

from any cause is in danger of leading an idle, dissolute, lewd, or immoral life, is within the jurisdiction of the juvenile court which may adjudge such person to be a ward of the court.''

(But see *In re Rambeau* (1968) 266 Cal.App.2d 1, 8-9 [72 Cal.Rptr. 171].)

[10]Even in adult criminal trials, of course, the standard of proof "beyond a reasonable doubt" applies only to the issue of guilt itself. A variety of lesser standards of proof governs other issues that may arise in the course of such proceedings:

(1) "Slight" or "prima facie" showing: proof of corpus delicti (*People* v. *Amaya* (1952) 40 Cal.2d 70, 76 [251 P.2d 324]).

(2) "Preponderance of the evidence": territorial jurisdiction of the crime (*People* v. *Cavanaugh* (1955) 44 Cal.2d 252, 262 [282 P.2d 53]); venue in the proper county (*People* v. *Megladdery* (1940) 40 Cal.App.2d 748, 764 [106 P.2d 84]); defendant's absence from the state, as tolling the statute of limitations (*People* v. *McGill* (1935) 10 Cal.App.2d 155, 159-160 [51 P.2d 433]); proof of insanity by defendant (*People* v. *Daugherty* (1953) 40 Cal.2d 876, 901 [256 P.2d 911]); defendant's proof of entrapment (*People* v. *Valverde* (1966) 246 Cal.App.2d 318, 325 [54 Cal.Rptr. 528]); cf. *Estate of Nelson* (1923) 191 Cal. 280, 286 [216 P. 368] [proof of guilt of a crime, when at issue in a civil case].

(3) "Preponderance of substantial evidence": proof of other crimes committed by defendant, to show identity through a common *modus operandi* (*People* v. *Durham* (1969) *ante,* pp. 171, 187 fn. 15 [74 Cal. Rptr. 262, 449 P.2d 198]).

(4) "Clear and convincing evidence": defendant's burden to support a motion to withdraw a guilty plea (*People* v. *Brotherton* (1966) 239 Cal.App.2d 195, 200 [48 Cal.Rptr. 513]).

[11]Thus characterized, their similarity to proceedings for the involuntary commitment of mentally ill persons or narcotic drug addicts becomes readily apparent. In the latter, the possibility of confinement for a substantial period of time likewise requires observance of basic rules of due process (see *In re Raner* (1963) 59 Cal.2d 635 [30 Cal.Rptr. 814, 381 P.2d 638]); yet in an opinion holding the Fourth Amendment and the exclusionary rule applicable to narcotics addiction commitments (*People* v. *Moore* (1968) 69 Cal.2d 674 [72 Cal.Rptr. 800, 446 P.2d 800]) we recently rejected a contention that the state must prove the fact of addiction beyond a reasonable doubt rather than by a preponderance of the evidence, observing that such proceedings "are fundamentally civil in nature" (*id.* at p. 685). The issue, moreover, was purely one of decisional law, there being no legislative directive on standard of proof in the narcotics addiction commitment statutes. (Welf. & Inst. Code, §§ 3000-3305.)

Turning to the writings of legal scholars on this question, we find a wide divergence of views. To begin with, in the appellate decisions and statutes of our sister states, as noted above, the weight of authority heavily favors the standard of preponderance of the evidence. Under analogous circumstances, the United States Supreme Court was called upon to decide whether the due process clause was violated by an Oregon statute requiring an accused who pleaded insanity to bear the burden of establishing that defense beyond a reasonable doubt. (*Leland* v. *Oregon* (1952) 343 U.S. 790 [96 L.Ed. 1302, 72 S.Ct. 1002].) The high court reasoned (at p. 798 [96 L.Ed. at pp. 1308-1309]), ''Some twenty states, however, place the burden on the accused to establish his insanity by a preponderance of the evidence or some similar measure of persuasion. While there is an evident distinction between these two rules as to the quantum of proof required, we see no practical difference of such magnitude as to be significant in determining the constitutional question we face here. Oregon merely requires a heavier burden of proof. In each instance, in order to establish insanity as a complete defense to the charges preferred, the accused must prove that insanity. The fact that a practice is followed by a large number of states is not conclusive in a decision as to whether that practice accords with due process, but it is plainly worth considering in determining whether the practice 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' *Snyder* v. *Massachusetts*, 291 U.S. 97, 105 [78 L.Ed. 674, 677, 54 S.Ct. 330, 90 A.L.R. 575] (1934).'' (Fn. omitted.) The court then concluded (at p. 799 [96 L.Ed. at p. 1309]), ''We are therefore reluctant to interfere with Oregon's determination of its policy with respect to the burden of proof on the issue of sanity since we cannot say that policy violates generally accepted concepts of basic standards of justice.''

The draftsmen of model acts have proposed the adoption, at various times, of each of the three standards of proof mentioned herein. In 1959 the United States Children's Bureau took the view that the standard should be preponderance of the evidence. (Comment to § 19 of the Standard Juvenile Court Act (1959) 5 Nat. Prob. & Parole Assn. J. 370.) In 1966, however, in a publication quoted and relied on by the Supreme Court throughout its *Gault* opinion (see, e.g., 387 U.S. at p. 38 [18 L.Ed.2d at p. 552], characterizing the work as ''authoritative''), the Children's Bureau recommended the special civil standard of clear and convincing evidence as

a "middle of the road position" or "reasonable compromise" between the majority civil standard and the minority criminal standard. (Standards for Juvenile and Family Courts (1966), U.S. Dept. of Health, Education and Welfare, Children's Bureau Pub. No. 437, p. 72.) In 1968 the Council of Judges of the National Commission on Crime and Delinquency also recommended the clear and convincing evidence standard, observing that an adjudicatory juvenile hearing "is not bound by the criminal procedure requirement of proof beyond a reasonable doubt." (Model Rules for Juvenile Courts (proposed final draft, May 1968), rule 26 and comment thereto.) By contrast, the National Conference of Commissioners on Uniform State Laws adopted the Illinois position (*In re Urbasek* (1967) *supra*, 232 N.E.2d 716) in requiring proof beyond a reasonable doubt in delinquency cases, but remained satisfied with the clear and convincing evidence standard in determining neglect or need of treatment. (Uniform Juvenile Court Act (final draft, August 1968), § 29.)

Similar disarray reigns in the recommendations of the law review writers. Even prior to *Gault*, contrary positions had been taken (compare Paulsen, *Fairness to the Juvenile Offender* (1957) 41 Minn.L.Rev. 547, 562-563 (disapproving reasonable doubt standard), with Antieau, *Constitutional Rights in Juvenile Courts* (1961) 46 Cornell L.Q. 387, 412 (approving reasonable doubt standard)); since *Gault*, the views have proliferated. Some authors call for extension of the reasonable doubt standard to juvenile proceedings (Dorsen and Rezneck, *In re Gault and the Future of Juvenile Law* (1967) 1 Fam. L.Q. 1, 26-27; Comment, *In re Gault and the Persisting Questions of Procedural Due Process and Legal Ethics in Juvenile Courts* (1968) 47 Neb.L.Rev. 558, 579-580), while others resist such a step (Welch, *Kent v. United States and In re Gault: Two Decisions in Search of a Theory* (1967) 19 Hast.L.J. 29, 36-38, 40-45) and criticize the courts that have taken it (Note (1968) 19 Syracuse L.Rev. 1041, 1046). The majority, however, propose compromise solutions of varying content. (See, e.g., Ketcham, *Guidelines from Gault: Revolutionary Requirements and Reappraisal* (1967) 53 Va.L.Rev. 1700, 1713 (a higher standard of proof than preponderance of the evidence, but not reasonable doubt unless right to jury trial is also granted); Lemert, *The Juvenile Court—Quest and Realities*, in Task Force Report: Juvenile Delinquency and Youth Crime (1967), p. 103 (favoring clear and convincing evidence standard, with reasonable doubt standard reserved for "the

most grievous juvenile law violations"); Boches, *Juvenile Justice in California*: *A re-evaluation* (1967) 19 Hast.L.J. 47, 92-93, 102 (preferring reasonable doubt standard. but "at least" clear and convincing evidence); Foster, *Notice and "Fair Procedure": Revolution or Simple Revision?,* in Gault: What Now for the Juvenile Court? (Inst. Cont. Legal Ed. 196), pp. 66-67 (reasonable doubt standard when deprivation of liberty is threatened, preponderance of the evidence in other cases); George, *Gault and the Juvenile Court Revolution* (Inst. Cont. Legal Ed. 1968), pp. 58-59 (reasonable doubt standard in delinquency cases, clear and convincing evidence standard in neglect cases.) If any leasson can be learned from this diversity of proposals, it is that no consensus exists among the scholars to support the proposition that *Gault* requires the use of the reasonable doubt standard in juvenile proceedings.

In the light of the foregoing analysis, we cannot conclude that the standard of proof provision of Welfare and Institutions Code section 701 (*ante*, fn. 7) is "clearly, positively and unmistakably" unconstitutional. (*Lockheed Aircraft Corp.* v. *Superior Court* (1946) *supra*, 28 Cal.2d 481, 484.) Accordingly, in the absence of a specific ruling on the issue by the United States Supreme Court. we adhere to the pre-*Gault* view of our courts that the established standard is valid and "No constitutional rights of the appellant have been infringed by the use of the preponderance of evidence test to determine the truth of the allegation that he had committed a crime." (*In re Johnson* (1964) *supra*, 227 Cal.App. 2d 37, 40.)

On appeal. of course, the issue is of narrower scope. We "cannot examine evidence to determine where the preponderance of the evidence lies. [Citations.] Our function is to determine whether the record contains any substantial evidence tending to support the finding of the trial court." (*In re Corey* (1964) 230 Cal.App.2d 813, 823-824 [41 Cal.Rptr. 379].) Such evidence is present in the case at bar.

The relevant statutory language defines manslaughter as a killing without malice "in the commission of a lawful act which might produce death . . . without due caution and circumspection" (Pen. Code, § 192. subd. 2). A negligent homicide may constitute manslaughter under that statute .if it results from. conduct which is "'such a .departure from' .what would be the conduct of an ordinarily prudent.or careful man under the same circumstances as to be incompatible with a

proper regard for human life, or, in other words, a disregard of human life or an indifference to consequences.' " (*People* v. *Penny* (1955) 44 Cal.2d 861, 879 [285 P.2d 926], quoting from 26 Am.Jur., Homicide, § 210, p. 299.) ■ In particular, "It is well settled that the law regards firearms as dangerous instrumentalities and requires a great degree of care in handling them. Criminal negligence is frequently found in the unintentional killing by a gun. [Citations.]" (*People* v. *Walls* (1966) 239 Cal.App.2d 543, 546 [49 Cal.Rptr. 82].) ■ And it is no defense that no harm was intended, for a homicide which "results from playing or skylarking with or the reckless handling of firearms" may properly be found to be manslaughter. (*People* v. *Sica* (1926) 76 Cal.App. 648, 651 (245 P. 461].)

■ Here it appears that appellant "thought" he had removed all the bullets from the gun while talking to Yolanda. He now argues that a 15-year-old youth's inadverent failure to "complete" such an unloading process can amount, as a matter of law, to no more than simple negligence. The argument misses the mark: appellant's culpability derives not from his inept unloading but from the fact that, although not certain he had removed all the bullets, he proceeded deliberately to pull the trigger, not once but twice, while hugging Yolanda and pointing the gun at her head. As the trial court emphasized, "holding the gun in that obvious close proximity, knowing a few minutes before he just apparently checked to see if the gun was unloaded and knowing full well that that gun had been loaded just prior to that, having previously fired this weapon, to me the act was obviously culpable." Such conduct displays a reckless disregard of human life, and amply supports the challenged finding of involuntary manslaughter. (Cf. *In re Hartman* (1949) 93 Cal.App.2d 801, 807 [210 P.2d 53].)

## II

■ Appellant next contends that his statements to the police were admitted into evidence in violation of the rules laid down in *Miranda* v. *Arizona* (1966) *supra,* 384 U.S. 436.

It cannot now be urged that appellant was not fully advised of his rights under *Miranda.* The transcript of the questioning of appellant in the sheriff's office on the night of the shooting reveals on its face that such advice was given. As to the earlier questioning at the scene itself, Officer Stamm testified that he used a slip or card "per accordance with the Miranda Decision and it was read to [appellant] and ex-

plained it to him at that time." It is true that when asked to paraphrase from memory the contents of the slip, Officer Stamm omitted to mention the required warning that anything appellant said could and would be used against him in court (see *Miranda* v. *Arizona, supra,* at p. 469 of 384 U.S. [16 L.Ed.2d at pp. 720-721]); it is also true that no such statement may be admitted in evidence unless the fact that full and complete warnings were given is "demonstrated by the prosecution at trial" (*id.* at p. 479 [16 L.Ed.2d at p. 726]), and a police officer's conclusory testimony that he gave the questionee advice "per accordance with the Miranda Decision" is inadequate to discharge such burden. ▮▮ We recognize that we are dealing here with a juvenile proceeding, in which the evidence of the state was presented by a nonlawyer probation officer rather than by a district attorney alert to the latest requirements of the decisions;[12] nevertheless, in the light of *Gault's* extension of the privilege against self-incrimination to these proceedings despite their essentially civil nature (387 U.S. at pp. 49-50 [18 L.Ed.2d at pp. 558-559]), we must find that the record is deficient in this respect. Although we will not fill the gap by presumption (*People* v. *Stewart* (1965) 62 Cal.2d 571, 581 [43 Cal.Rptr. 201, 400 P.2d 97], affd. sub nom. *Miranda* v. *Arizona* (1966) *supra,* 384 U.S. 436), the witness' oversight appears to have been of the sort which could easily have been corrected had it been promptly called to his attention. Appellant's able trial counsel, however, did not choose to make an appropriate objection, and in such circumstances the objection will be deemed waived. (*People* v. *Castro* (1968) 257 Cal.App.2d 643, 645-646 [65 Cal.Rptr. 62], and cases cited; cf. *People* v. *Doherty* (1967) 67 Cal.2d 9, 14-15 [59 Cal.Rptr. 857, 429 P.2d 177].)

Appellant contends, rather, that because he was a minor at the time of the questioning he should be held incompetent as a matter of law to waive his rights without the advice of a parent or an attorney. In fairness to appellant's counsel, we note that the proceedings in this case took place a year before our decision in *People* v. *Lara* (1967) 67 Cal.2d 365 [62 Cal. Rptr. 586, 432 P.2d 202]. ▮▮ We there held that the issue of a minor's capacity to waive these rights must be resolved on the "totality of circumstances" shown by the record. We recognized that the advice and consent of an adult in this

---

[12]In the course of oral argument, for example, it was conceded that "being a Probation Officer we do not have extensive experience in case law. . . ."

connection "is of course to be desired, and should be obtained whenever feasible," but we concluded that "whether a minor knowingly and intelligently waived these rights is a question of fact; and a mere failure of the authorities to seek the additional consent of an adult cannot be held to outweigh, in any given instance, an evidentially supported finding that such a waiver was actually made." (*Id.* at p. 379.)

Applying these rules to the facts in *Lara,* we found such a capacity to waive in the following circumstances; "Here the officers specifically asked each defendant if he understood the statement of rights just given to him, and each replied that he did. There was testimony that at the time of the questioning Lara was 'very calm' and gave no indication of having consumed alcoholic beverages, and Alvarez appeared 'cognizant and aware.' Each defendant, moreover, concluded his handwritten confession with a full statement of his *Dorado* rights. Also relevant is the fact that each defendant, though young, had had considerable experience with the police and the courts. (*People* v. *Reeves* (1966) 64 Cal.2d 766, 775 [51 Cal. Rptr. 691, 415 P.2d 35].) Thus Alvarez admitted to the defense psychologist that 'he had had more arrests and convictions than he could remember since the age of 11 or 12. He had been used to this type of environment [i.e., incarceration]'; and Lara testified that only four months before his arrest in the present case he had been arrested on a narcotics charge and had been informed he had a right to counsel and to remain silent and that anything he said could be used against him, and court-appointed counsel had in fact been furnished to him." (Fn. omitted; pp. 376-377 of 67 Cal.2d.) The United States Supreme Court denied certiorari. (392 U.S. 945 [20 L.Ed.2d 1407, 88 S.Ct. 2303].)

Appellant attempts to distinguish *Lara* on factual grounds, but none is persuasive. He points out that during the two or three days between the crime and the arrests in *Lara,* the defendants "had the opportunity" to consult with adults; but there was no showing, of course, that they did so in fact. Appellant stresses that at the time of the interrogations he was 15 years old, whereas Alvarez, the younger codefendant in *Lara,* was 17; yet our opinion recited expert testimony (67 Cal.2d at p. 377) to the effect that Alvarez had a considerably lower "mental age" and an I.Q. of 65 to 71. As *Lara* makes clear, chronological age alone is not determinative of the question of capacity: "The issue, as with all matters of waiver, is to be resolved upon the whole record." (*Id.* at p. 376.)

In the case at bar. there is no showing that appellant was of less than normal intelligence or had an inadequate understanding of the situation facing him. On the contrary, the record demonstrates that he was well aware of the gravity of his act and had the presence of mind, within moments after the shooting, to divest himself of his weapon, to invent and maintain his elaborate and superficially plausible story of a phantom assailant (*ante*, fn. 1), and to engage in a melodramatic hot pursuit of the villain. Officer Piper testified, on cross-examination, that while appellant was recounting this quixotic tale ''he seemed very contained and didn't appear to be upset or depressed or even excited. He appeared unconcerned, really, to me.'' Appellant subsequently recanted, but only when confronted with the gun found in the adjacent yard. At that time, after reading and explaining to appellant the contents of the ''advisement slip.'' Officer Stamm gave him a copy which appellant signed and retained in his possession. The officer testified that appellant appeared to have no difficulty understanding this advice.[13] Again, at the outset of the questioning in the sheriff's office appellant acknowledged that he had previously been advised of his rights, and produced the signed slip. The deputy district attorney nevertheless readvised him fully, including a specific warning that ''if you say anything it can and will be used against you in a court of law, and in your case a juvenile court since you are fifteen years old.'' He then asked, ''Do you understand these rights?'' Appellant replied in the affirmative, and proceeded to make his statement. Lastly, as in *Lara*, appellant was not an inexperienced first offender, but was already a veteran of numerous brushes with the law.[14]

Appellant next turns to alleged procedural distinctions. He complains that he was not given, as were the defendants in

---

[13]To avoid future conflicts on this issue, we recommend that juvenile officers and police be prepared to give their compulsory *Miranda* warnings in terms that reflect the language and experience of today's juveniles.

[14]Beginning shortly after his fourteenth birthday, appellant was arrested on four occasions for such offenses as burglary, curfew violation with suspicion of burglary, and battery, and was twice adjudged a ward of the court. Upon the second adjudication he was committed to the Sacramento County Boys Ranch, and it was only three months after his release from that institution that he stole the gun with which he subsequently killed his girl friend. Although appellant's counsel pointed out at oral argument that the trial court had not read the probation report prior to ruling on the question of waiver (see *In re Corey* (1968) 266 Cal. App.2d 295 [72 Cal.Rptr. 115 ]), he conceded that the court would have been aware in any event that the youth who stood before him had already been adjudged a ward.

*Lara,* a "long" hearing on the issue of waiver; but the length of that hearing resulted principally from the introduction of conflicting expert testimony on Alvarez' claim of mental retardation, an issue not involved in the present case.

Finally, appellant charges that the explicit finding of waiver made in *Lara* was not made here; but "Although it is good practice for the trial court to make an explicit finding that a defendant waived his constitutional rights, no such finding is required; a finding of waiver may be implied from the fact that the trial court received a defendant's extrajudicial statement in evidence after receiving proof that the defendant had been advised of his rights as required by *Dorado* [or, here, *Miranda*] before the statement was made." (*People* v. *Rodriguez* (1967) 256 Cal.App.2d 663, 668 [64 Cal.Rptr. 253] [17-year-old youth charged with murder]; cf. *People* v. *Thomas* (1967) 65 Cal.2d 698, 704-705 [56 Cal.Rptr. 305, 423 P.2d 233], and cases cited.)

The record thus bears out the juvenile judge's personal appraisal of appellant's maturity: in ruling on the culpability of his conduct, the judge observed, "I don't think we have a naive fifteen-year-old. I think he fully understood what was going on. He knew the gun was loaded when he went over there and he gave it a cursory examination and, obviously, he didn't pick up one of the shells. That naive little young man had a—within seconds after an act, a terrible act causing the death of a young fifteen-year-old girl, had the unmitigated gall to make up a story and identify some person—his outward appearance was that of calmness, not of excitement. It doesn't strike me as the naive little fifteen-year-old. Instead of being shocked, complete hysteria, sick at heart at this moment, what does he do? He makes up a story and goes chasing off [after] an alleged person that shot the girl, and then throws the bullet and the gun into a vacant lot."

From the totality of the circumstances in this case we conclude there is substantial evidence that appellant had the capacity to understand the meaning of the warnings given him, and that he knowingly and intelligently waived the rights here in issue. Accordingly, there was no error in admitting the challenged statements into evidence.

The judgment is affirmed.

Traynor, C. J., McComb, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

PETERS, J.—I dissent. This case presents the question of the impact of the decision of the United States Supreme Court in *In re Gault*, 387 U.S. 1 [18 L.Ed.2d 527, 87 S.Ct. 1428], upon the concepts that juvenile court proceedings are not criminal and are non-adversary, concepts embodied in our statutes and decisions which predated *Gault*. Whatever may be said of that decision, and there are many divergent interpretations of it, it stands for the proposition that a minor must be afforded the same rights granted a defendant in a criminal case unless there are compelling reasons why such rights should not be granted, and that state decisions and statutes providing to the contrary are violative of the United States Constitution. This fundamental lesson of the *Gault* decision is disregarded by the majority. Certainly the right to a jury trial and the right to insist that guilt be shown beyond a reasonable doubt are fundamental and constitutional rights in a criminal case. This the majority concede. But the majority contend that the determination that the minor shall be a ward of the court is not criminal in nature. The majority spend 19 pages of lengthy discussion that does no more than confuse the issue. It urges that in juvenile proceedings these rights are not fundamental. Certainly to the minor the proceedings are adversary and criminal in nature. The determination that the minor shall be a ward of the court may result in the confinement of the minor during minority and complete restriction on his freedom of action. Realistically, a proceeding that may result in such confinement and restraint is adversary in nature and criminal in effect. To hold that such a proceeding is not adversary in nature and criminal in effect is to close one's eyes to the realities of the situation, and, as well, is contrary to the teachings of *Gault*.

There is also involved a highly debatable *Miranda* issue. In *People* v. *Lara*, 67 Cal.2d 365 [62 Cal.Rptr. 586, 432 P.2d 202], the majority of this court held that a waiver of a minor's constitutional rights should not be measured by the same rule applicable to adults but must be measured by the "totality of circumstances." Here the record shows the police read to the minor the *Miranda* warnings from a card. To hold that after the mere reading and parroting of the *Miranda* rights a confession constitutes a knowing waiver of constitutional rights without the advice of a parent, adult or lawyer is to simply disregard the limitations on the waiver rule announced in *Lara* so far as minors are concerned.

I would reverse the judgment.