Filed 10/27/25

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br> Plaintiff and Respondent,<br> v.<br>FERNANDO SEVILLA,<br> Defendant and Appellant. | A169669<br><br>(Alameda County Super. Ct. No. 20CR015549A) |

Defendant Fernando Sevilla appeals a judgment convicting him of voluntary manslaughter, shooting at an occupied vehicle, and illegally carrying a loaded firearm in an incorporated city, and sentencing him to an aggregate term of 21 years 8 months in prison. He contends that the trial court committed prejudicial error in refusing his requested instruction on involuntary manslaughter and abused its discretion by declining to strike the Penal Code[1] section 12022.5, subdivision (a) enhancement. He also argues that the great bodily injury enhancement attached to his manslaughter conviction is invalid. We agree that the great bodily injury enhancement should be stricken but affirm the judgment in all other respects.

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II and III.

[1] All undesignated statutory references are to the Penal Code.

# BACKGROUND

In July 2022, Sevilla and codefendant Willey Samuels were charged with murder (§ 187, subd. (a); count 1); shooting at an occupied motor vehicle (§ 246; count 2); and carrying a loaded firearm in an incorporated city (§ 25850, subd. (a); count 4).[2] The information alleged enhancements under counts 1 and 2 for using a firearm during the commission of a felony (§§ 12022.5, subd. (a)) and for causing great bodily injury by doing so (§§ 12022.7, subd. (a), 12022.53, subd. (d)). It further alleged enhancements under count one for intentionally using and discharging a firearm during the commission of a murder (§§ 12022.53, subds. (b), (c)). The information also alleged two circumstances in aggravation (Cal. Rules of Court, rule 4.421(a)(1), (2)).

As to Sevilla, the following evidence was presented at trial:

In the early hours of November 6, 2020, Sevilla used his employer's company truck to commute to work from his home in Oakland. In the truck, he carried a loaded .45 caliber semi-automatic handgun that he had purchased illegally. During the drive, he encountered a woman—the victim in this case—in an area he knew was frequented by prostitutes. The victim approached the truck at a traffic light, and she offered to engage in an unspecified sex act for money. Sevilla agreed.

The victim got in the truck and directed Sevilla to drive to a nearby park. The victim texted someone throughout the drive. Once they arrived at the park, she continued to text, and then she asked for $200. According to Sevilla, he took out roughly $500 in cash from his pocket, and the victim

---

[2] Samuels was also charged with possession of a firearm by a felon (§ 29800, subd. (a)(1); count 3) as well as other special allegations and two circumstances in aggravation not relevant here.

pulled out a gun and demanded it all.  After Sevilla surrendered his money, the woman got out of his truck, ran across the street, and got inside a car that was parked with the lights off.  Surveillance video captured the victim jog across the street and enter the car, but it did not show what took place in the truck, nor did it show that she was carrying cash or a gun.

The two vehicles sat still for about two minutes until Sevilla decided to confront the occupants of the other car.  He retrieved his handgun from under the passenger seat as he made a three-point turn, pulled up next to the car, and turned on his headlights.  The driver of the car, Samuels, rolled down his window, and Sevilla partly lowered his window.  Samuels then produced a large handgun.

Sevilla testified that, after a brief verbal exchange, Samuels fired at him.  Sevilla said he felt two bullets go past his head and the truck window's glass rain down on him.  Sevilla further testified that, in response to being shot at, he "grabbed the firearm," "racked the slide," and "shot off two shots" "[t]owards the driver[,] [t]owards the car," even though he "knew" both Samuels and the victim were only three to four feet away in the car.

The surveillance video captured the gunfight but did not resolve who fired first.  Nor did the surveillance video capture what happened inside the two vehicles.  The physical evidence showed that, in total, counting both of them, Sevilla and Samuels fired five to six shots from two different guns.

Without checking to see if anyone had been hurt, Sevilla sped off and drove to work.  He had, however, shot the victim in the head.  Samuels drove her to the hospital where she later died.

Once at work, Sevilla dropped off the damaged truck and used a different vehicle for the day.  Around midday, he called someone to replace the truck's broken windows, and he personally filled in the bullet holes with

putty and painted over the patch job. Sevilla also broke his gun with a sledgehammer and threw it away in a dumpster, which he admitted doing because he believed he possibly "could have shot someone" even as he maintained that he did not see he had shot the victim.

Sevilla did not report the robbery or the shooting to the police. However, the police identified the truck as belonging to Sevilla's employer and contacted Sevilla's boss. Sevilla then misrepresented the incident to his boss, claiming he had been cut off in traffic and caught in a "crossfire." He also omitted that he had picked up a prostitute, been robbed, and fired a gun himself. Sevilla's boss urged him to contact the police, but Sevilla did not and was arrested a few weeks later.

Sevilla acknowledged that, after his arrest, he lied to the police. Sevilla told them that he had been driving in the area where the incident occurred because the freeway was blocked and he was delivering a paycheck to a coworker. Sevilla further said that he drove down the alleyway where the shooting took place because he heard an argument. After the police informed Sevilla there was surveillance video of a woman leaving his truck, Sevilla said she approached his truck for the first time at the park. Moreover, he repeatedly denied firing a gun in self-defense or otherwise. At trial, Sevilla said he lied because he was "scared" and he "would have to explain everything" about picking up the victim.

The jury found Sevilla not guilty of murder, but it found him guilty of the lesser included charge of voluntary manslaughter and of the remaining charges. It also found the great bodily injury and firearm enhancements true.[3]

---

[3] The jury reached the same verdict for Samuels and found him guilty of count 3.

4

At sentencing, Sevilla requested that the trial court impose the mid and lower triad term sentences for voluntary manslaughter and the corresponding gun enhancement under section 12022.5, subdivision (a) (section 12022.5(a)), respectively. He also asked the court to stay his sentence for count 2 and to strike the corresponding gun enhancement under section 12022.53, subdivision (d) pursuant to section 1385, subdivision (c) (section 1385(c)).

The trial court imposed an aggregate sentence of 21 years 8 months in prison. It designated the voluntary manslaughter conviction as the principal count and imposed the aggravated term of 11 years. The court imposed the aggravated term of 10 years for the firearm enhancement under section 12022.5(a) and stayed the great bodily injury enhancement under section 12022.7.[4] The court stayed sentencing for the conviction for shooting at an occupied vehicle pursuant to section 654, and it imposed one-third the middle term of eight months for the possession of a firearm conviction.[5]

## DISCUSSION

### I.

Sevilla contends the trial court committed reversible error in refusing his requested instruction on involuntary manslaughter. The court concluded that the instruction was unwarranted because there was no substantial evidence that Sevilla acted without malice: He "testif[ied] that he got the gun

---

[4] At the sentencing hearing, the court imposed three years for the great bodily injury enhancement. (§ 12022.7) But off the record, the court stayed the enhancement.

[5] Although the jury also found the firearm enhancements under section 12022.53, subdivisions (b) through (d) true, section 12022.53 does not apply to voluntary manslaughter convictions. (See § 12022.53, subd. (a) [enumerating felonies to which the section applies].)

out, placed it at the ready and, in his own words, pointed it and intentionally fired it at least at the car" from "about three or four paces" away. "[T]o say that [these actions] were without malice, I think it's kind of disassociated from the facts that have been presented to this jury." We perceive no error.

## A.

Courts are " 'forums for the discovery of truth,' " and the truth may lie between the prosecution's assertions of a defendant's guilt on the charged offenses and the defendant's protestations of innocence. (*People v. Barton* (1995) 12 Cal.4th 186, 196 (*Barton*).) Hence, trial courts must give instructions on lesser included offenses, sua sponte, " ' " 'when the evidence raises a question as to whether all of the elements of the charged offense were present.' " ' " (*People v. Wyatt* (2012) 55 Cal.4th 694, 698.) Indeed, "the court must instruct on the alternate theory *even if it is inconsistent with the defense elected by the defendant . . . .*" (*Barton*, at p. 195.)

However, a court's obligation to instruct on a lesser included offense does not arise "whenever *any* evidence, no matter how weak, is presented to support an instruction, but only when the evidence is substantial enough to merit consideration by the jury." (*Barton*, *supra*, 12 Cal.4th at 195, fn. 4; see *People v. Thomas* (2012) 53 Cal.4th 771, 813 ["An instruction on a lesser included offense must be given only if there is substantial evidence from which a jury could reasonably conclude that the defendant committed the lesser, uncharged offense but not the greater, charged offense"] (*Thomas*).) In this context, " '[s]ubstantial evidence is . . . evidence that a reasonable jury could find persuasive.' " (*People v. Lewis* (2001) 25 Cal.4th 610, 645, quoting *Barton*, at p. 201, fn. 8.) We review a challenge to the trial court's failure to instruct on a lesser included offense de novo. (*People v. Licas* (2007) 41 Cal.4th 362, 366.)

6

Relevant here, manslaughter is a lesser included offense of murder. (*People v. Lewis*, *supra*, 25 Cal.4th at p. 645.) Murder is an unlawful killing with malice aforethought (§ 187), while manslaughter is an unlawful killing without malice. (§ 192.)

Malice may be express or implied. " 'Express malice is an intent to kill. . . . Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 941–942; see also *People v. Swain* (1996) 12 Cal.4th 593, 603 ["under an implied malice theory of second degree murder, the requisite mental state for murder—malice aforethought—is by definition 'implied,' as a matter of law, from the specific intent to do some act dangerous to human life together with the circumstance that a killing has resulted from the doing of such act" (italics omitted)].)

"A defendant commits voluntary manslaughter when a homicide that is committed either with intent to kill or with conscious disregard for life—and therefore would normally constitute murder—is nevertheless reduced or mitigated to manslaughter" due to mitigating circumstances which negate the element of malice. (*People v. Bryant* (2013) 56 Cal.4th 959, 968 (*Bryant*).) A defendant's heat of passion due to a legally sufficient provocation, or alternatively his actual but unreasonable belief in the imminent need for self-defense, will " 'reduce an intentional, unlawful killing from murder to voluntary manslaughter "by *negating* the element of malice that otherwise inheres in such a homicide." ' " (*People v. Schuller* (2023) 15 Cal.5th 237, 252; § 192, subd. (a).) Heat of passion precludes malice because it is "a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation."

7

(*People v. Beltran*, *supra*, 56 Cal.4th at p. 942.)  And imperfect self-defense " 'obviates malice because that most culpable of mental states "cannot coexist" with an actual belief that the lethal act was necessary to avoid one's own death or serious injury at the victim's hand.' " (*Schuller*, at p. 252.)

By contrast, a defendant commits *in*voluntary manslaughter by committing a homicide with the mens rea of criminal negligence.  (*People v. Butler* (2010) 187 Cal.App.4th 998, 1006–1007.)  The offense must be based on one of three predicate acts:  (1) killing in the commission of a misdemeanor (§ 192, subd. (b)); (2) killing "in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection" (*ibid.*); or (3) killing in the commission of "a noninherently dangerous felony . . . 'committed without due caution and circumspection.' " (*Bryant, supra*, 56 Cal.4th at p. 966; see *People v. Penny* (1955) 44 Cal.2d 861, 879 [a "lack of 'due caution and circumspection' " means " 'criminal negligence' "].)  "The performance of an act with criminal negligence supplies the criminal intent for involuntary manslaughter, regardless whether the conduct underlying the offense is a misdemeanor, a lawful act, or a noninherently dangerous felony." (*Butler*, at p. 1008.)

"Criminal negligence is ' "aggravated, culpable, gross, or reckless . . . conduct . . . [that is] such a departure from what would be the conduct of an ordinarily prudent or careful [person] under the same circumstances as to be incompatible with a proper regard for human life . . . ." ' [Citation.] 'Under the criminal negligence standard, knowledge of the risk is determined by an objective test:  "[I]f a reasonable person in defendant's position would have been aware of the risk involved, then defendant is presumed to have had such an awareness." ' " (*People v. Valdez* (2002) 27 Cal.4th 778, 783.)

In sum, defendants who either intend to kill or knowingly act with conscious disregard for their action's natural and probable endangerment to human life have acted with malice and are guilty of either murder or voluntary manslaughter. By contrast, a defendant who commits a predicate act endangering human life without realizing the risk involved, when a reasonable person in the same position would have been aware of that risk, has acted with criminal negligence and is guilty of involuntary manslaughter. (*See People v. Evers* (1992) 10 Cal.App.4th 588, 597 [finding no error where trial court did not instruct jury on involuntary manslaughter because the severity of the injuries "[made] clear that whoever abused [the victim] had to know such abuse would likely cause serious injury or death" and because there was no evidence anything precluded defendant from knowing the probable consequences of his actions] (*Evers*).)

**B.**

Sevilla asserts that the evidence "supported an instruction on the brandishing a weapon theor[y] of involuntary manslaughter." Misdemeanor brandishing a weapon is defined as drawing or exhibiting a firearm "in a rude, angry, or threatening manner" in another's presence, or "unlawfully us[ing] a firearm in any fight or quarrel." (§ 417, subd. (a)(2).) Apparently relying on the first of these two definitions, Sevilla initially argues that his testimony "provided sufficient evidence to support a defense theory that appellant was engaged in the misdemeanor of brandishing a firearm just prior to the shooting." We disagree that evidence that Sevilla drew or exhibited his gun in an angry or threatening manner alone entitles him to an instruction on involuntary manslaughter, because it is not substantial evidence of his mental state in firing the gun—or put another way, it is not substantial evidence that he was guilty *only* of misdemeanor brandishing.

9

Accepting his argument would mean that a trial court would be required to instruct on involuntary manslaughter even if the defendant testified that he angrily drew his weapon intending to kill the victim and then did so. Sevilla identifies no authority supporting that view.

Presumably turning to the second definition, Sevilla alternatively argues that his testimony "provided substantial evidence to support a finding that he fired the gun due to criminal negligence." We are not persuaded by this argument either. Sevilla explains that "the negligent handling or use of a firearm can constitute the mens rea required for involuntary manslaughter," but his authority for that proposition are cases in which the defendant either fired the gun unintentionally or lacked awareness about whether it was loaded. (E.g., *Thomas, supra*, 53 Cal.4th at p. 814 ["an accidental shooting that occurs while the defendant is brandishing a firearm . . . could be involuntary manslaughter"]; *In re Dennis M.* (1969) 70 Cal.2d 444, 461, disapproved on another ground *In re Joseph G.* (1970) 7 Cal.App.3d 695, 704; *People v. Southack* (1952) 39 Cal.2d 578, 583; *People v. Carmen* (1951) 36 Cal.2d 768, 776, disapproved on other grounds by *People v. Flannel* (1979) 25 Cal.3d 668; *People v. Clark* (1982) 130 Cal.App.3d 371, 382, abrogated by *People v. Blakeley* (2000) 23 Cal.4th 82, 91–92; *People v. Walls* (1966) 239 Cal.App.2d 543, 546–547; *People v. Glenn* (1991) 229 Cal.App.3d 1461, 1465–1467 [defendant's testimony that his stabbing of the victim was accidental supported involuntary manslaughter instruction], abrogated by *Blakeley*, at p. 91.)[6] There was no evidence of any such negligent accident here: Sevilla testified that he intentionally fired a loaded weapon twice into an occupied vehicle.

Sevilla maintains that an involuntary manslaughter instruction was nonetheless required because his testimony furnished evidence that he

---

[6] In contrast to criminally negligent accidents, an unintentional killing that results from a *non*negligent accident or misfortune is not a crime. (*People v. Mehserle* (2012) 206 Cal.App.4th 1125, 1138.)

10

"responded out of fear because he thought he had been shot; his response was autonomic and lacked the specific intent to kill." He identifies no case, however, in which such an instruction was held to be required because there was evidence that the defendant deliberately fired at an assailant out of fear.

He points to *People v. Lee* (1999) 20 Cal.4th 47 (*Lee*), in which the defendant became extremely intoxicated and began arguing with his wife, and at one point retrieved a handgun and resumed arguing with her. (*Id.* at pp. 52–53 (plur. opn. of Baxter, J.).) Although there was no eyewitness testimony about the shooting itself, the couple's daughter recounted that her parents were pushing each other with the gun between them, and after she went to her bedroom, she heard a shot and then "saw her father holding [her mother] who was lying on the floor, begging her not to die." (*Id.* at p. 53.) The evidence showed that the victim "had died instantly from a contact or near contact gunshot to the head just above her eye." (*Ibid.*) As in this case, the jury acquitted the defendant of second degree murder but convicted him of voluntary manslaughter. (*Id.* at p. 55.)

The trial court had instructed the jury on involuntary manslaughter based on two theories: an ordinarily lawful act that posed a high risk of death or great bodily harm without due caution and circumspection, and a killing by a person who was unconscious as a result of voluntary intoxication. (*Lee, supra*, 20 Cal.4th at p. 54 (plur. opn. of Baxter, J.).) On appeal, the defendant argued that the court erred by failing also to instruct sua sponte on a misdemeanor brandishing theory of involuntary manslaughter. (*Id.* at p. 55.) Although there was no majority opinion, all but one of the justices agreed with the defendant on that point, but they did not describe how, based on the evidence presented, the shooting might have occurred to warrant that

11

conclusion.[7]  The Attorney General contends that their conclusion was based on the possibility that the shooting was accidental, as suggested by the evidence of intoxication and the fact that the defendant was immediately found grieving over his wife's body.  While we do not speculate about unexpressed reasons for any justice's opinion, we agree with the Attorney General at least to this extent:  We find no basis to conclude that a majority of the court would have endorsed the misdemeanor brandishing theory of involuntary manslaughter if the defendant had testified that he intentionally pointed the loaded gun at his wife from a short distance away and then deliberately pulled the trigger.

The pivotal question is whether there was sufficient evidence for a reasonable juror to find that Sevilla acted *without* consciously realizing the risk to life posed by his decision to shoot twice into an occupied vehicle from a few feet away.  (*Evers, supra*, 10 Cal.App.4th at p. 596.)  At the outset, we

---

[7] The plurality opinion stated:  "As the Court of Appeal recognized, when defendant used his gun in the quarrel with [his wife] he violated section 417, subdivision (a)(2), committing the misdemeanor offense of 'brandishing' a weapon."  (*Lee, supra*, 20 Cal.4th at p. 61 (plur. opn. of Baxter, J.).)  The opinion did not otherwise identify the facts relevant to this conclusion, and because the Court of Appeal's opinion was unreported, it is unavailable to shed additional light on the issue.  Justice Mosk, joined by Justice Werdegar, agreed with the plurality that an instruction under a brandishing theory was required, but did not provide more explanation for that conclusion.  (*Id.* at p. 74 (dis. opn. of Mosk, J.).)  Justice Kennard indicated that she believed the brandishing theory was supported by the fact that the defendant "was highly intoxicated and arguing with his wife when he shot her; there was no direct evidence that he intended to kill her or even that he intended to fire the gun."  (*Id.* at p. 83 (dis. opn. of Kennard, J.).)  Justice Brown, by contrast, concluded that no instruction on a brandishing theory was required because "[i]t appears that at a bare minimum, when defendant used his gun during the quarrel with his wife, he committed felony assault."  (*Id.* at p. 69 (conc. opn. of Brown, J.).)

reject Sevilla's unsupported assertion that the trial court "overstepped its bounds" and usurped the jury's role by concluding that the evidence showed that he acted with malice. The only way the trial court could decide whether to instruct on involuntary manslaughter was by evaluating whether there was substantial evidence that Sevilla acted without malice. Undertaking the necessary analysis, it properly concluded that there was not.

To recap, Sevilla testified that he pulled his gun out *before* he pulled up next to Samuels's car and that he knew it was loaded at the time. He further testified that, after Samuels shot at him, he "grabbed the firearm," "racked the slide," and "shot off two shots" "[t]owards the car" even though he "knew" both Samuels and the victim were only three to four feet away in the car. Sevilla answered affirmatively when asked if he had "held the gun . . . out" his car window, "pulled the trigger on purpose," and fired the second shot "again on purpose." Sevilla later reiterated that he pointed the gun in the direction of the occupied vehicle "[b]ecause [Samuels] shot at me from there." While Sevilla denied intending to kill the victim or "anybody that night," that testimony is not substantial evidence that he lacked conscious awareness of the risk his conduct posed to human life. (See *Evers, supra*, 10 Cal.App.4th at pp. 597–598.) And there was no testimony, whether from an expert or Sevilla himself, suggesting that his fear rendered him unable to appreciate the harm that shooting twice into an occupied vehicle could cause.[8] We agree

---

[8] Sevilla testified that he feared for his life when he fired the gun and that he carried the gun "because of fear" after having been robbed multiple times, including at home and at work. Moreover, as noted in the next section, at sentencing Sevilla furnished evidence that he had been diagnosed with posttraumatic stress disorder resulting from these prior incidents. But evidence of his diagnosis, or of how fear or prior trauma could have compromised his capacity to recognize the risk of firing his weapon into the car, was not presented at trial.

13

with the trial court's assessment that the only inference the jury could reasonably draw from the evidence presented was that Sevilla acted with at least implied malice, i.e., that he realized and disregarded the risk posed by his actions.

Lastly, we disagree with Sevilla's contention that the jury's rejection of the murder charge itself means that there was substantial evidence that he acted without malice. Rather, as discussed above, the voluntary manslaughter verdict means the jury found that malice—either express or implied—was negated by Sevilla's heat of passion or unreasonable belief that he was in imminent danger.

Accordingly, the trial court did not err by declining to instruct on involuntary manslaughter.[9]

## II.

Sevilla contends the trial court abused its discretion by declining to strike the section 12022.5(a) enhancement because it did not acknowledge all pertinent mitigating factors and did not give " 'great weight' " to certain mitigating factors as required by section 1385(c). The Attorney General argues the court did not abuse its discretion because it "reasonably focused on the choices Sevilla made immediately before, during, and after the shooting." The Attorney General has the stronger argument.

---

[9] Beyond his theory based on misdemeanor brandishing, Sevilla offers a single, conclusory statement that "the jury could have concluded that [he] committed an unintentional homicide in the course of a non-inherently dangerous felony, which might produce death if committed without due caution and circumspection." Because this argument is undeveloped and unsupported by citations to the record, we do not consider it. (See *People v. Brannon-Thompson* (2024) 104 Cal.App.5th 455, 467; *Doe v. Ledor* (2023) 97 Cal.App.5th 731, 748.)

14

## A.

Paragraph (1) of section 1385(c) provides that "the court shall dismiss an enhancement if it is in the furtherance of justice to do so" unless prohibited by an initiative statute. In exercising its discretion under subdivision (c)(1), a trial court "shall consider and afford great weight to evidence offered by the defendant" to prove one of nine enumerated mitigating circumstances. (§ 1385, subd. (c)(2).) As relevant here, these enumerated mitigating circumstances include when multiple enhancements are alleged in a single case, when the application of an enhancement could result in a sentence of over 20 years, and when the offense is connected to mental illness or prior victimization. (§ 1385, subd. (c)(2)(B)–(E).)

"Construed as a whole, the statute makes clear that all the mitigating circumstances listed in [section 1385] subdivision (c)(2) merely guide the court's discretion in determining whether a dismissal is in furtherance of justice." (*People v. Mazur* (2023) 97 Cal.App.5th 438, 445; *People v. Anderson* (2023) 88 Cal.App.5th 233, 239 ["the statement that a court 'shall' dismiss certain enhancements appears as a subpart to the general provision that a 'court shall dismiss an enhancement *if* it is in the furtherance of justice to do so' "].) Nonetheless, "absent a finding that dismissal would endanger public safety, a court must assign significant value to the enumerated mitigating circumstances when they are present. In practice, the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement unless the sentencing court finds substantial, credible evidence of countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice.' " (*People v. Walker* (2024) 16 Cal.5th 1024, 1038.)

We review the trial court's sentencing decision for abuse of discretion and will not set it aside unless it is so irrational or arbitrary that no reasonable person could reach the same result. (See *People v. Carmony* (2004) 33 Cal.4th 367, 376–377 (*Carmony*).)

However, in the face of a silent record, it is presumed the trial court correctly followed the applicable law. (*Carmony*, *supra*, 33 Cal.4th at p. 378; Cal. Rules of Court, rule 4.409 ["Relevant factors enumerated in these rules must be considered by the sentencing judge, and will be deemed to have been considered unless the record affirmatively reflects otherwise"].) Nothing in section 1385 requires a court to make an affirmative finding when declining to exercise its discretion to dismiss an enhancement. (*People v. Brugman* (2021) 62 Cal.App.5th 608, 637; see e.g., *People v. Knowles* (2024) 105 Cal.App.5th 757, 768–769 [rejecting claim the sentencing court failed to properly apply section 1385(c) because it did not mention all the mitigating evidence].) Therefore, to achieve a remand for resentencing, a defendant must affirmatively demonstrate that the trial court misapplied or misunderstood the scope of its sentencing discretion. (*People v. Coleman* (2024) 98 Cal.App.5th 709, 724.)

**B.**

Sevilla's challenge fails because the record does not reasonably suggest that the trial court failed to engage in the section 1385(c) analysis or that its stated sentencing decisions were arbitrary and unreasoned.

No evidence affirmatively shows that the trial court failed to consider the pertinent legal principles and policies that should have guided its sentencing decision. It expressly stated that it "read and consider[ed]" Sevilla's sentencing memorandum, which presented Sevilla's argument that section 1385(c) compelled dismissal of the section 12022.53, subdivision (d)

16

enhancement, and defense counsel submitted the matter on the papers. Moreover, counsel did not object to the court's failure to mention section 1385(c) or the proffered evidence of mitigating circumstances. On appeal, Sevilla cannot bear his burden to affirmatively show error by relying on the fact that the court did not do so. (*People v. Coleman, supra,* 98 Cal.App.5th at p. 724.)

The record demonstrates that the trial court's discretionary sentencing determinations were reasoned. It selected voluntary manslaughter as the principal offense because it thought "the voluntary manslaughter verdict is the more appropriate factual basis upon which to sentence as opposed to the shooting into an inhabited vehicle, which just happened to be the situation [Sevilla and Samuels] found themselves in." Accordingly, the court did *not* impose a sentence of 25 years to life for count 2 because the sentence was stayed pursuant to section 654. However, the court declared that it "want[ed] to make it clear that [its sentencing decision] [was not] some form of leniency for either defendant." Rather, the court believed the sentence was "a reflection of the findings of a jury that deliberated and struggled with this over the course of multiple days," which the court thought "need[ed] to be respected."

Having selected voluntary manslaughter as the principal offense, the trial court emphasized that Sevilla had time to deliberate before he armed himself and confronted Samuels. The court then raised how Sevilla "lied to the police repeatedly over the course of many hours" and destroyed the murder weapon and covered up other evidence of the crime. The court further opined that Sevilla lied on the stand, specifically pointing to Sevilla's testimony on cross examination about "the significant efforts that he had to undertake to retrieve [his] gun and to, in his words, fire back in self-defense

17

at Mr. Samuels." In the court's view, the surveillance video "proved his testimony [about self-defense] to be totally and utterly false. [¶] He had that gun out and I think it's abundantly clear he was ready to use it and he did . . . ." It concluded, based on those comments and a finding of the aggravating factors true, that Sevilla should be sentenced to the aggravated term of the voluntary manslaughter offense *and* the aggravated term of the section 12022.5(a) enhancement to be served consecutively. These findings were based on substantial evidence and could support a reasoned determination that dismissal of the enhancement was not in furtherance of justice.

Accordingly, we see no abuse in the trial court's discretionary determination to impose aggravated term for the section 12022.5(a) enhancement. Even if reasoned people may disagree with the court's judgment, we may not disturb the sentence on that basis. (*Carmony*, *supra*, 33 Cal.4th at p. 377.)

In any event, remand is not required if the record clearly indicates the trial court would have made the same decision. (*People v. Flores* (2020) 9 Cal.5th 371, 432.) On this record, we conclude it would have.

To be sure, several mitigating factors were present in Sevilla's favor. As the trial court acknowledged, Sevilla had no prior criminal history and had been a productive member of society supporting a family. (See Cal. Rules of Court, rule 4.423(b)(1).) And multiple enhancements were alleged and the imposition of the firearm enhancement could (and did) result in a sentence of over 20 years. (See § 1385, subd. (c)(2)(B), (C).) Sevilla was also diagnosed by a forensic psychologist with posttraumatic stress disorder (PTSD) stemming from prior robberies he suffered. Sevilla urged the court that his "emotionally driven decisions," including "grabbing a gun and confronting"

18

Samuels and the victim for robbing him, were connected to his PTSD.  (See *id.*, subd. (c)(2)(D), (E).)

Nonetheless, the trial court made clear that any remand would be an idle act.  The trial court imposed the aggravated term for the enhancement because it did not want the relatively lower sentence for selecting count 1 as the primary offense (as compared to the sentence if count 2 had been the principal offense) to be viewed as leniency.  It therefore would not dismiss the enhancement under section 1385(c)(2)(C) because the sentence was over 20 years.  The court's exposition regarding Sevilla's deliberation before the shooting and its rejection of his self-defense testimony demonstrate that it would not accept Sevilla's argument on remand that his conduct was due to his reactivity from his PTSD (or at least that it would not dismiss the enhancement "in the furtherance of justice" under section 1385(c)(2)(D) or (E)).  Finally, while multiple enhancements were alleged, the court only applied a single enhancement, rendering section 1385(c)(2)(B) moot.  Thus, assuming arguendo it had not considered the section 1385(c)(2) factors, it is clear the court would not have exercised its discretion to eliminate the firearm enhancement "in the interest of justice."

### III.

Sevilla argues that the great bodily injury finding under section 12022.7, subdivision (a), on count 1 must be reversed because it is unauthorized.  The People do not contest the issue.  We agree that the enhancement is unauthorized under section 12022.7, subdivision (g), which provides, "This section shall not apply to murder or manslaughter."

### DISPOSITION

The great bodily injury enhancement (§ 12022.7, subd. (a)) is stricken from count 1.  The judgment is otherwise affirmed.

19

GOLDMAN, J.

WE CONCUR:

STREETER, Acting P. J.
CLAY, J. *

---

*Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

| | |
|---|---|
| Trial Court: | Superior Court of Alameda County |
| Trial Judge: | Honorable Paul A. Delucchi |
| Counsel for Plaintiff and Respondent: | Rob Bonta<br>Attorney General of California<br>Lance E. Winters<br>Chief Assistant Attorney General<br>Jeffrey M. Laurence<br>Senior Assistant Attorney General<br>Bridget Billeter<br>Supervising Deputy Attorney General<br>David M. Baskind<br>Deputy Attorney General |
| Counsel for Defendant and Appellant: | Jennifer A. Mannix, under appointment by the Court of Appeal |